## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

John Erar,

               Plaintiff,

v.

City of Andover, a Minnesota municipal
corporation, and Don Jacobson, Mike Knight
and Julie Trude, individuals,

               Defendants.

**REPORT AND
RECOMMENDATION
CONCERNING DEFENDANTS'
MOTION FOR PARTIAL
SUMMARY JUDGMENT**

Court File No. 04-3742 HDV/RAW

Before the Court is defendants' motion for partial summary judgment [22], filed October 29,
2004. This case arises from the termination of plaintiff John Erar's employment as City
Administrator for the City of Andover, Minnesota, in April 2004. In his Second Amended Complaint
Erar has brought claims against all defendants under 42 U.S.C. § 1983 for violations of his rights
guaranteed by the First Amendment and the Due Process Clause of the Fourteenth Amendment to
the U.S. Constitution (Count III); against the City for violation of the Minnesota Government Data
Practices Act (MGDPA), Minn. Stat. § 13.43, *et seq.* (Count IV);[1]  against the City for violation of
Minnesota's Whistleblower Statute, Minn. Stat. § 181.932 (Count V); and against the City for breach
of contract (Count VI). He has brought additional claims against defendants Don Jacobson, Mike
Knight, and Julie Trude, all city councilmembers, for tortious interference with contract and

---

[1] In a footnote in his brief and at the end of the affidavit of plaintiff's counsel, plaintiff asks
that the Court continue summary judgment proceedings with respect to his MGDPA claim, citing
Fed. R. Civ. P. 56(f). The request is denied. Plaintiff has not advanced reasons why he could not by
affidavit present facts essential to justify his opposition to the motion with respect to the claim, and
he has had ample opportunity while the motion has been pending to conduct discovery and seek
leave to supplement the summary judgment record.

prospective economic relations under Minnesota common law (Count I) and violation of Minnesota's

Open Meeting Law, Minn. Stat. § 13D.01, et seq. (Count II).

The Court has federal question jurisdiction of the federal civil rights claim, 28 U.S.C. § 1331,

and supplemental jurisdiction over the state law claims, 28 U.S.C. § 1367(a).

Defendants have moved for summary judgment on Counts I, IV and VI and the § 1983 Due

Process claim in Count III to the extent based on deprivation of a property right. The matter is

before me for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). The motion is fully

submitted following briefing and argument.

# I.

## SUMMARY JUDGMENT

Defendants are entitled to summary judgment if the affidavits, pleadings, and discovery

materials "show that there is no genuine issue as to any material fact and that [they are] entitled to

judgment as a matter of law." Erenberg v. Methodist Hospital, 357 F.3d 787, 791 (8th Cir. 2004)

(citing Fed. R. Civ. P. 56(c)); see Legrand v. Area Resources for Community and Human Services,

394 F.3d 1098, 1101 (8th Cir. 2005). The Court must view the facts in the light most favorable to

plaintiff, and give him the benefit of all reasonable inferences which can be drawn from them, "that

is, those inferences which may be drawn without resorting to speculation." Mathes v. Furniture

Brands Int'l, Inc., 266 F.3d 884, 885-86 (8th Cir. 2001) (citing Sprenger v. Federal Home Loan Bank

of Des Moines, 253 F.3d 1106, 1110 (8th Cir. 2001)); see Matsushita Elec. Indus. Co., Ltd. v. Zenith

Radio Corp., 475 U.S. 574, 587 (1986); John Q. Hammons Hotels, Inc. v. Acorn Window Systems,

Inc., 394 F.3d 607, 610 (8th Cir. 2005). An issue of material fact is genuine if it has a real basis in

the record. Hartnagel v. Norman, 953 F.2d 394, 395 (8th Cir. 1992) (citing Matsushita, 475 U.S. at

586-87 (1986)).  A genuine issue of fact is material if it "might affect the outcome of the suit under governing law."  Hartnagel, 953 F.2d at 395 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)); see Hitt v. Harsco Corp., 356 F.3d 920, 923 (8th Cir. 2004).

In resisting summary judgment plaintiff must "go beyond the pleadings and by affidavits, depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue of material fact."  Rouse v. Benson, 193 F.3d 936, 939 (8th Cir. 1999); see Hesse v. Avis Rent A Car System, Inc., 394 F.3d 624, 629 (8th Cir. 2005); Hitt, 356 F.3d at 923. In assessing the motion for summary judgment the Court must determine whether a fair-minded trier of fact could reasonably find for plaintiff based on the evidence presented.  Anderson, 477 U.S. at 248; Herring v. Canada Life Assurance Co., 207 F.3d 1026, 1030 (8th Cir. 2000).

## II.

## FACTUAL BACKGROUND

Though there are many disputes about the events which led up to and the reasons for Mr. Erar's termination, the present motion is predicated in the main on the application of Minnesota law to facts which do not appear to be genuinely disputed.[2] What follows is, for the most part, Erar's version of the relevant events leading up to the termination of his employment.

On February 20, 2001 the City Council of the City of Andover unanimously voted to approve an employment contract with John Erar employing him as City Administrator with a start date of April 12, 2001. (Dickinson Aff., Ex. B). At the time, the council was comprised of Mayor Mike Gamache, and councilmembers Ken Orttel, Julie Trude, Mike Knight and Don Jacobson. (Id., ¶ 2).

---

[2] The parties' R. 26(f) Report filed October 19, 2004 contains a summary of their respective factual contentions.

The City's Ordinance No. 216 established the City Administrator position and defined its duties and responsibilities. The ordinance described the administrator as the "Chief Administrative Officer of the municipality." (Id., Ex. A).

The employment contract was in the form of a letter agreement signed by Erar and Mayor Gamache, and approved by the City Council, the terms of which had been negotiated through an executive search firm. (Dickinson Aff.,  Ex. C). The agreement specified:

> **Terms and Conditions of Employment**: You will serve at the will of the Council and may be terminated with or without cause at any time. Should the Council terminate you without cause, you will receive severance compensation for six months.

(Id., Ex. C at A00124). The circumstances that would provide cause for dismissal were set out. (Id. at A00125).

Ordinance No. 216 also addressed the City Administrator's term of office.

> [The City Administrator] serves at the discretion of the elected mayor and council . . .
> . . . .
>
> The City Administrator shall be appointed for an indefinite period by a majority of the City Council and may be removed from office only by a majority of the City Council in accordance with the rules and procedures set forth in the City's personnel policy.

(Dickinson Aff., Ex. A at A00457, 459).  The written personnel policy in turn stated: "The City will discipline, suspend, demote or dismiss employees for just cause only. . . ." (Id., Ex. G at A00473). The policy identified levels of discipline and procedures pertaining to discharge. (Id. at A00473-74). Only the City Administrator or his designee could initiate a discharge, subject to the approval of the City Council. (Id. at A00474).  All City employees were covered by the policy "unless specifically stated otherwise." (Id. at A00472). Elected officials, members of boards and commissions, and

4

"[o]ther positions so designated" were excluded. (<u>Id.</u>) The City Council reserved the right to modify the personnel policy as needed. (<u>Id.</u>)

As noted, Erar commenced his employment April 2, 2001. (Dickinson Aff., Ex. C at A00123). In May 2001 the city began examining the need for a sports complex and community center and organized a task force to research the feasibility of the project. (Erar Aff. ¶ 4; Gamache Depo. at 12).

A six-month review of Erar's performance was conducted by an outside consultant in October 2001 and was generally favorable with some suggestions for improvement. (Dickinson Aff., Ex. D). An annual review was conducted on April 15, 2002. The evaluation was based on the comments of councilmembers. Erar was rated as meeting or exceeding expectations in all areas and he received a pay increase. (Fabian Aff., Ex. 2).

Erar believes his relationship with the city council began to go downhill in the summer of 2002. On or around July 13, 2002, the chair of the community center task force, Frank Kellogg, sent an e-mail concerning the center to councilmember Trude via the city's e-mail server with copies to Mayor Gamache and councilmembers Knight and Orttel.[3] (Orttel Depo. at 22-23). Kellogg wrote in relevant part:

> . . . the Council needs to understand that if the timeline is to [sic] long than [sic] a private group may intervene and build all or part of the facility. I believe that there are additional dollars to possible [sic] obtain as well if, we get creative but we may need to return favors with a major developer.

(Fabian Aff., Ex. 4). The communication and its potential status as a public document created a stir.

---

[3] Apparently there is some dispute between the parties as to whether this e-mail was in response to one from Trude.

The e-mail came to Erar's attention. He spoke to William Hawkins, the City Attorney, who, according to Erar, told Erar and City Finance Director Jim Dickinson (Erar's eventual successor) that the e-mail was most likely public data available under the MGDPA, an opinion shared by Erar. (Erar Aff. ¶ 7). Erar sent a copy of the e-mail to councilmember Jacobson, who had not been copied on it originally, apparently informing him of its public status. (Erar Aff. ¶ 7). Erar recommended that councilmembers distance themselves from what he saw as a proposal that the city enter into some kind of improper "quid pro quo" arrangement with a developer. (Id. ¶ 8). On July 15, Trude sent an e-mail to Kellogg in which she professed "total outrage and anger" at his "creative" suggestion. She said he should resign from the task force. (Fabian Aff., Ex. 5). Trude then spoke to City Attorney Hawkins about public access to the e-mail. Hawkins changed his opinion and told Trude Kellogg's e-mail was private and not public. (Id., Ex. 6; Erar Aff. ¶ 10). This together with an apology and explanation from Kellogg apparently abated Trude's outrage and she withdrew the request he resign. (Fabian Aff., Ex. 6).

Trude's anger then turned on Erar. The flap was not over. On July 17, 2002 the City Clerk and the City's Human Resources Manager also expressed opinions that Kellogg's e-mail was public data under the MGDPA. (Fabian Aff., Ex. 7; Erar Aff. ¶ 11). On July 18, defendant Knight contacted Erar regarding Erar's opinion that the Kellogg e-mail was public data, complaining the community had no right to know its contents. Knight recommended Erar leave the e-mail issue alone. (Erar Aff. ¶ 12). The same day, Trude contacted Erar several times by e-mail. She asserted Erar had misrepresented the City Attorney's opinion, that the Kellogg e-mail was a private communication

(which she added was her own legal opinion) ,[4] suggested Erar drop the matter to avoid "unwanted publicity," demanded Erar destroy the e-mail, indicated  Kellogg's wife had deleted the e-mail from the Kellogg computer, and said that if Erar continued to hold copies of the e-mail she would consider it a violation of her privacy. (Fabian Aff., Exs. 8 and 9). Erar spoke with Hawkins and indicated he would not destroy the e-mail but suggested the issue be referred to the State Department of Administration. (Erar Aff. ¶ 13). Trude reacted by telling Erar she would no longer communicate with him by e-mail. (Id. ¶ 14). On July 19, 2002 Erar notified Kellogg that the City Council accepted Hawkins' legal opinion on the classification of the e-mail and he would abide by Hawkins' legal opinion notwithstanding his own views. (Erar Aff. ¶ 15). On July 20, 2002 Trude told Erar she had set her computer to block his e-mails. (Fabian Aff., Ex. 10).

On or around November 13, 2002 Erar's office presented a report to the City Council with recommendations about the process for hiring contractors to design and build the community center. Attached to the report was the City Attorney's written opinion that a "design-build" project in which one firm is selected to design and build all facets of the project was not authorized by state law.  The opinion also advised state law required competitive bids. Erar's report did not support the alleged preference of councilmembers Trude and Knight for a single contractor, such as local contractor OPUS Corporation. (Erar Aff. ¶ 18; Orttel Depo. at 28-29). Defendant Knight made an unsuccessful attempt to have the report rejected. (Erar Depo. at 122). Ultimately the city invited competitive bids for a project architect and construction manager.

The City selected a panel of individuals to interview qualified bidders. Trude was not a member.  Knight was. (Erar Aff. ¶ 18). Trude said she would participate as an observer. (Id.)

---

[4] Trude is a lawyer. (Fabian Aff., Ex. 8).

According to Erar, Trude told the panel she would be disappointed if OPUS did not receive an interview, and both Trude and Knight pushed OPUS as the design and building contractor. (Id. ¶¶ 20, 24).

At a panel session on January 16, 2003 Trude made comments which Erar believed to be political. He reminded Trude that the panel's job was technical -- to select the best firm(s) and present a realistic budget -- whereupon Trude became upset and abruptly left the meeting. (Fabian Aff., Ex. 11 at JT00201). On January 18 and 20, Trude left telephone messages for Erar, demanding access to the requests for proposals (RFP's) on which bids were being submitted. (Id.). On January 21, 2003 Trude appeared at City Hall with a member of the public to review RFP's under the eye of the City Clerk. (Id. at JT00201-202). At a city council meeting that evening, Trude made publicly televised statements complaining that Erar had improperly denied her access to project materials. (Erar Aff. ¶ 23). Afterward Erar sent a lengthy memorandum to the Mayor and city councilmembers in which he gave his version of what  transpired at the January 16 panel meeting, denied he had obstructed Trude's access to proposals, and complained that "Trude's allegations have caused me great personal and professional distress in what I view as a clear attempt of retaliation intended to publicly damage my reputation and create an environment of intimidation and distrust of staff." (Fabian Aff., Ex. 11 at JT00202).

On or around February 25, 2003, Erar's staff prepared a report regarding the recommendations of the interview panel. At a City Council workshop that day, Knight and Trude argued against the recommendations, which had rejected OPUS' bid. (Erar Aff. ¶ 26). Knight attempted to resurrect the bid. (Orttel Depo. at 37-39). The city council ultimately voted 3-2 to adopt the committee's recommendation. (Erar Aff. ¶ 26).

8

Erar received his annual performance evaluation around April 24, 2003. Trude rated Erar below expectations in all categories, and Knight rated Erar below expectations in most categories. (Fabian Aff., Exs. 14-15). In contrast, the other councilmembers generally rated Erar as exceeding or meeting expectations. (Id., Ex. 17). Trude admitted her comments were a "spill over" from her previous issues with Erar, mentioning specifically the Kellogg e-mail. (Erar Aff. ¶ 28; Erar Depo. at 210). Erar submitted a lengthy response to the negative comments in his evaluation, characterizing them as retaliatory and contrary to public record. (Fabian Aff., Ex. 18 at A0058). Mayor Gamache and Erar attempted to arrange a mediation session with Trude and Knight, which they rejected. (Erar Aff. ¶ 29; Gamache Depo. at 67-69).

On or around September 19, 2003 Erar and Mayor Gamache observed councilmembers Trude, Knight and Jacobson speaking together in the parking lot of a local country club after a civic event. When Erar later asked Jacobson about their conversation, Jacobson admitted the three had been discussing the details of a land purchase for the community center Erar had been authorized to negotiate with owners Ken and Mary Slyzuk. (Erar Aff. ¶ 30; Gamache Depo. at 87-88). At a subsequent workshop on September 23, 2003, Trude, Knight and Jacobson accused Erar of unethical behavior in negotiating the land purchase. (Erar Aff. ¶ 31). In a meeting with Jacobson, City Attorney Hawkins, and City Finance Director Dickinson the next day, Erar provided evidence his negotiations with the Slyzuks were undertaken in consultation with the City Attorney, the community center capital campaign consultants and Dickinson. Hawkins confirmed Erar's actions were legal. (Erar App. ¶ 32).

In November 2003 while Erar was on vacation Trude, Knight and Jacobson requested information from Dickinson about Erar's use of personal leave time. Dickinson provided the information to them. (Erar Aff. ¶ 33).

At a January 2004 council workshop, Trude, Knight and Jacobson accused Erar of acting outside the scope of his authority in negotiating a lease agreement with the YMCA concerning the community center. (Orttel Depo. at 70). Erar provided documentation concerning his authority. Mayor Gamache contacted all parties, praising Erar and criticizing Trude, Knight and Jacobson. (Fabian Aff., Ex. 19).

In January and February 2004 Jacobson, Knight and Trude voted to eliminate a private developer's contribution to public road improvements in connection with the developer's project. (Erar Aff. ¶ 35; Orttel Depo. at 73-76). The County Engineer, City Engineer and the City Community Development Director all recommended that the developer pay approximately $300,000 as its share. (Erar Aff. ¶ 35). Erar told defendant Jacobson the vote was a departure from the city's "practice and policy of private development paying for itself." (Id.)

In March 2004 a controversy arose concerning Erar's authority to supervise the manager of the ice arena, part of the community center. Knight told Erar on the record he would never agree to give Erar such authority, although the City Human Resources Manger had provided a memo regarding the City Administrator's role in overseeing city operations. (Orttel Depo. at 80; Erar Aff. ¶ 36).

On March 12, 2004 Erar provided the City Council with his written input for his upcoming performance review. (Fabian Aff., Ex. 20). He then went on vacation, returning on or around March 24, 2004. During Erar's absence, Trude and Knight again requested a report on Erar's use of personal

leave time. (Orttel Depo. at 62-63). On March 25, 2004 Erar prepared a memo regarding his use of vacation leave and compensatory time. He offered to meet with the City Council to discuss any issues. (Orttel Depo. at 63; Erar Aff. ¶ 37; Fabian Aff., Ex. 21).

On or about April 1, 2004 City Attorney Hawkins called Erar and said he had received a series of calls from three councilmembers who said they wanted to fire him. He did not identify the councilmembers. (Erar Depo. at 214-15). Hawkins said he would be willing to negotiate a separation agreement. At the time, there had been no city council meeting concerning Erar's performance or possible termination. (Erar Aff. ¶ 38).

On April 5, 2004 Trude told Erar's administrative assistant and the City Human Resources Manager that Erar was going to be terminated. (Id. ¶ 39; Erar Depo. at 255-56; Fabian Aff., Ex. 22).

On April 12, 2004 Erar received a copy of an e-mail Trude had sent to the President of the Andover Athletic Association, Tom Berard, in which she complained about Erar. In commenting about the location of some softball fields, Trude wrote:

> . . . We have disagreements with the administrator's way of thinking on a number of critical issues going back to the location. He [Erar] saw this as a "cheap site" b/c of the sewer/water access. He is not one who understands the shortage of play fields in this city -- never having been a sideline dad b/c he was a workaholic. Now he's biding time looking for a better job where he can run the council and staff w/o accountability to constituent interests -- he's taken over 10 weeks off (full weeks) in the past year and missed meetings involving the council and Y.

(Fabian Aff., Ex. 23 at JT00303; Erar Aff. ¶ 40).

On April 20, 2004 the City Council held an executive session to conduct Erar's annual performance review. (Fabian Aff., Ex. 24). Jacobson made a motion to terminate Erar's employment, seconded by Knight. (Id. at A00314). Erar asked to be allowed to resign rather than be fired. After

a lengthy discussion about the terms and circumstances of Erar's termination, Jacobson withdrew his motion and made a second motion, again seconded by Knight, to authorize City Attorney Hawkins to prepare a separation agreement with Erar which would be presented to the council for approval on April 28. If there was no agreement with Erar by then negotiations would be extended for one more day after which Erar would be terminated. (Id. at A00322). The motion carried with Jacobson, Knight and Trude voting in favor, Mayor Gamache against and Orttel "present." (Id. at A00322-23).

On April 28, 2004 during a special meeting of the City Council, Trude, Jacobson and Knight voted to approve the separation agreement between Erar and the City. Mayor Gamache and Orttel refused to participate and were recorded as "present." (Fabian Aff., Ex. 27). Erar's employment with the City officially ended on April 30, 2004. (Erar Aff. ¶ 43).

As noted, the factual summary to this point has been from Erar's perspective. For their part defendants state that Erar had a controlling management style, felt threatened by the city council, believed his judgment was superior to that of councilmembers, made staff fearful and morale suffered under his leadership. Trude, Knight and Jacobson attribute Erar's termination to their belief that by the spring of 2004 it was apparent Erar's "philosophies, management style and expectations did not fit with those of a majority of the Council." (Def. Mem. at 3).

## III.

## DISCUSSION

**A.      Breach of Contract/Tortious Interference Claims**

1.      <u>Failure to Proceed by Certiorari</u>

Minnesota law requires that, absent a state statute or local ordinance providing otherwise,

challenges to quasi-judicial local government decisions may only be brought in the Minnesota Court

of Appeals by petition for writ of certiorari within 60 days of the adverse action. See Willis v.

County of Sherburne, 555 N.W.2d 277, 280-81 & n.2 (Minn. 1996); Dietz v. Dodge County, 487

N.W.2d 237, 239-40 (Minn. 1992)(both citing State ex rel. Ging v. Bd. of Education of Duluth, 213

Minn. 550, 571, 7 N.W.2d 544, 556 (1942)(overruled in part on other grounds Foesch v. Indep. Sch.

Dist. No. 646, 300 Minn. 478, 223 N.W.2d 371 (1974)); Minn. Stat. § 606.01 (60-day period). The

termination of public employees is a quasi-judicial decision as the Minnesota Supreme Court has

just recently reaffirmed. The "general rule [is] that certiorari is the exclusive remedy for wrongful

termination claims brought by employees of an executive body that has less than statewide

jurisdiction."[5] Tischer v. Housing and Redevelopment Authority of Cambridge, 693 N.W.2d 426,

428 (Minn. 2005); see Willis, 555 N.W.2d at 280-81; Dietz, 487 N.W.2d at 240; Larson v. City of

Fergus Falls, 229 F.3d 692, 695 (8th Cir. 2000). The preference for review by certiorari results from

"judicial recognition of separation of power" concerns. Dietz, 487 N.W.2d at 239. "[T]he decision

of an executive body to terminate an employee is a discretionary exercise of its administrative

powers" entitled to judicial deference. Tischer, 693 N.W.2d at 428.

> Review by certiorari is limited to an inspection of the record of the inferior tribunal in which the court
> > is necessarily confined to questions affecting the jurisdiction of the board, the regularity of its proceedings, and, as to merits of the controversy, whether the order or determination in a particular case was arbitrary, oppressive, unreasonable, fraudulent, under an erroneous theory of law, or without any evidence to support it.

---

[5] Executive bodies with statewide jurisdiction are subject to the judicial review of employment decisions under the Minnesota Administrative Procedure Act. Tischer, 693 N.W.2d at 428 n.2 (citing statutory provisions).

Dietz, 487 N.W.2d at 239 (quoting Ging, 213 Minn. at 571, 7 N.W.2d at 556). Certiorari thus affords "nonintrusive and expedient judicial review" which, because of the 60-day limitations period, is on the basis of a "fresh record." Dietz, 487 N.W.2d at 239-40; see Tischer, 693 N.W.2d at 429. Certiorari review is also economical. Id.

Federal courts applying Minnesota law are, of course, obliged to follow the Tischer, Willis and Dietz line of cases. See Larson, 229 F.3d at 695. Consequently, "[a] terminated employee who has not sought certiorari review may not bring a state law breach of contract damage action for wrongful termination in either a state or a federal court." Id.

Erar did not seek certiorari review in the Minnesota Court of Appeals and may not under Minnesota law sue the City for breach of contract. Whether Erar's tortious interference with contract and prospective economic relations claim against the individual defendants is also barred presents a closer question. How a terminated Minnesota local governmental employee labels a cause of action is not determinative of whether the remedy is solely by certiorari review. The starting point is whether the claim "will . . . involve any inquiry into the [municipality's] discretionary decision to terminate" the employee. Willis, 555 N.W.2d at 283. To make out a *prima facie* case of tortious interference with his employment contract Erar must, among other things, show that Jacobson, Knight and Trude without justification procured a breach of the employment contract. See Metge v. Central Neighborhood Improvement Ass'n, 649 N.W.2d 488, 500 (Minn. App. 2002). As the relevant breach is Erar's termination and the termination decision for the City was made by Jacobson, Knight and Trude, trial of the tortious interference claim would seem to inevitably involve

inquiry into the termination decision.[6] See Stephens v. Bd. of Regents, 2002 WL 1315809 at *2 (Minn. App. 2002)(no jurisdiction over unspecified common-law tort claims against University because regardless of how "cloaked" they all "implicate[d] an alleged breach of the employment contract and demand[ed] scrutiny of how the University exercised its administrative discretion," citing Willis). In an unpublished decision[7] the Minnesota Court of Appeals, relying on Willis, held a tortious interference claim against a supervisor was included in the exclusive certiorari remedy because the same "common nucleus of operative facts" was involved and the supervisor was acting in her capacity as a county employee. Narum v. Burrs, 1997 WL 526304 at *1-2 (Minn. App. 1997).

The difficulty in extending the certiorari-only rule to the tortious interference claim here has to do with the defendant councilmembers' role in instigating Erar's termination. Like the officer or agent of a private corporation, the councilmembers were privileged to interfere or cause a breach of Erar's contract with the City so long as they acted in good faith, in which case their acts were those of the City and the City, under well-established law, could not interfere with its own contract. See Nordling v. Northern States Power Co., 478 N.W.2d 498, 505, 507 (Minn. 1991). But if they acted with actual malice, for example to pursue a personal vendetta, then they acted outside the

---

[6] This is also the case with the prospective economic relations prong of the claim. The prospective economic relationship was that derived from continued employment.

Erar asserts that his tortious interference claim is also based on acts other than the termination, including false accusations about his performance, negative performance ratings which did not fairly reflect his accomplishments, denial of a salary increase and damage to his reputation. As indicated in the text, Erar's complaints about his treatment at the hands of Trude, Knight, and Jacobson are inextricably tied to the termination decision made by them.

[7] Stephens and Narum are unpublished opinions of the Minnesota Court of Appeals and therefore do not have precedential value. Minn. Stat. § 480A.08, subd. 3(c). They may, however, be considered for their persuasive value. Youngquist v. Cincinnati Ins. Co., 625 N.W.2d 178, 184 (Minn. App. 2001).

scope of their duties as councilmembers and could be found liable for tortious interference with

Erar's employment contract. Id. at 506-07; Guercio v. Production Automation Corp., 664 N.W.2d

379, 389 (Minn. App. 2003). Consequently, actual malice is necessarily an additional element in

Erar's tortious interference claim against Jacobson, Knight and Trude.

In Lueth v. City of Glencoe, 2002 WL 31059892 (D. Minn. 2002), Judge Magnuson of this

Court concluded in the case of an action against a police chief by a terminated police officer that the

requirement of malice placed a tortious interference claim outside the umbrella of Willis, Dietz, and

now Tischer. Judge Magnuson reasoned:

> . . . Nordling's mechanism for holding individuals liable for the bad
> faith or malicious termination of an employee in certain
> circumstances does not encroach upon the protections afforded to the
> discretionary acts of executive bodies by Willis and Dietz. Because
> the rule of Nordling does not make the employer, in this case the city,
> liable, the court finds that the rule of Willis and Dietz is not
> applicable to Lueth's tortious interference with contract claim.

2002 WL 31059892 at *8.

The Minnesota Court of Appeals decision in Narum, supra, conflicts with the holding

in Lueth. Narum was decided on the premise that the supervisor in that case was acting within the

scope of her duties and not for some personal reason. 1997 WL 526304 at *2. However, if the

councilmember defendants are found liable for tortious interference they will have been found to

have acted with actual malice, outside the scope of their duties.[8] In the Court's judgment there is no

sound reason for employing the certiorari-only rule to insulate the *ultra vires*, malicious acts of

municipal agents from redress in litigation. Separation of power principles do not require deference

---

[8] The sufficiency of the evidence to establish actual malice is not in issue on the present
motion.

16

to a decision "predominantly motivated by malice and bad faith . . . by personal ill-will, spite, hostility or a deliberate intent to harm the plaintiff employee," Nordling, 478 N.W.2d at 507, because such a decision is not really the decision of the municipality at all. The Court thus concludes that Judge Magnuson's decision in Lueth presents the better-reasoned analysis which the Minnesota Supreme Court would be most likely to follow.[9]

The motion for summary judgment should be granted with respect to the breach of contract claim (Count VI), but not with respect to the tortious interference claim (Count I).

---

[9] Erar's other arguments with respect to the tortious interference claim lack merit. He argues he should not be limited to certiorari review because the City did not follow its own Ordinance No. 216 and personnel policy in terminating him, he was not given written "due notice" of the termination decision to trigger the certiorari statute's 60-day limitations period, and the City's actions deprived him of a reviewable record.

The claim that the City failed to follow its own procedures for terminating an employee is precisely the kind of "regularity of . . . proceedings" issue suited to certiorari review. See Dietz, 487 N.W.2d at 239; Larson, 229 F.3d at 694 (in which Minnesota Court of Appeals had reversed a discharge decision for failure to follow the terms of a labor agreement).

The claimed lack of written "due notice" of the termination decision does not avoid the certiorari remedy for several reasons. First, the factual basis for the argument is untenable. The cessation of Erar's employment was memorialized in a written separation agreement signed by him. (Dickinson Aff., Ex. F). Second, the applicability of the 60-day certiorari limitations period is itself an issue properly resolved in the certiorari proceeding. See Senior v. City of Edina, 547 N.W.2d 411, 415 (Minn. App. 1996)(resolving certiorari timeliness issue). Third, whether Erar received written notice of the termination should not affect the exclusiveness of the certiorari remedy because the only consequence of the failure to provide notice is that certiorari review remains open to him.

Lastly, "[t]he absence of a complete record . . . does not entitle the former employee to bring an action in district court rather than by writ of certiorari." Shaw v. Bd. of Regents, 594 N.W.2d 187, 193 (Minn. App. 1999)(citing Dokmo, 459 N.W.2d at 675); see Tischer, 693 N.W.2d at 431. The lack of an adequate record for review is not prejudicial to one in Erar's position because if the record is inadequate the Minnesota Court of Appeals may conclude the termination decision is not supported by substantial evidence or order the public body to expand the record or augment its findings. Tischer, 693 N.W.2d at 431; Shaw, 594 N.W.2d at 193.

2.      Statutory Immunity

Defendants argue Erar's tortious interference claim is also barred by "statutory immunity." When Minnesota waived its sovereign immunity it statutorily preserved certain exceptions to the waiver. Janklow v. Minn. Bd. of Examiners, 552 N.W.2d 711, 715 (Minn. 1996).This statutory immunity was also extended to municipalities for various kinds of claims, including "[a]ny claim based upon the performance or failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused." Minn. Stat. § 466.03, subdiv.6. See Davis v. Hennepin County, 559 N.W.2d 117, 120 (Minn. App. 1997). The immunity accorded the state and municipalities for discretionary functions, though separately codified, is "substantially similar." Id. at 121 n.2. Where statutory immunity is applicable, it is absolute. Id. at 120; Freier v. Indep.Sch. Dist. No. 197, 356 N.W.2d 724, 731 (Minn. App. 1984).

Statutory immunity has been held to apply to a government body's decision to terminate a public employee.

> . . . The decision to terminate an employee is almost always a discretionary act -- especially when that employee is a member of a management team -- because such decisions can involve the balancing of many complex factors. This court has previously observed that decisions to terminate employees involve policy decisions best made by the body charged with such decisions.

Janklow, 552 N.W.2d at 717 (citing Hueman v. Indep. Sch. Dist. No. 77, 243 Minn. 190, 194, 67 N.W.2d 38, 40-41 (1954)); see Freier, 356 N.W.2d at 731 ("decision . . . to discharge a teacher falls within the realm of discretionary functions and duties" under § 466.03, subd. 6). As City Administrator Erar was not only a member of the City's management team, he was the head of the team. By its nature the decision to discharge the chief administrative officer of a municipality involves the kind of balancing of complex factors the discretionary function exception was intended to immunize from municipal liability.

The immunity preserved by § 466.03 expressly extends only to the municipality. "[S]tatutory immunity protects the government as an entity" and, like the certiorari-only rule, is intended to reinforce the separation of power. <u>Janklow</u>, 552 N.W.2d at 715-16; <u>see</u> <u>Anderson v. Anoka Hennepin Indep. Sch. Dist. 11</u>, 678 N.W.2d 651, 655 & n. 4 (Minn. 2004). It is not intended to protect public officials from individual liability for their own torts. <u>See</u> <u>Rico v. State</u>, 472 N.W.2d 100, 106 n.4 (Minn. 1991). However, statutory immunity has been extended to employees in situations where the government entity would be required to indemnify the employee.

> [T]he state is required to indemnify the employee for acts and omissions committed within the scope of employment except "in case of malfeasance in office or willful or wanton actions or neglect of duty." In instances where the employee is not indemnified, the employee's only potential shield is official immunity.

<u>Watson v. Metropolitan Transit Comm'n</u>, 553 N.W.2d 406, 415 (Minn. 1996)(quoting <u>Rico</u>, 472 N.W.2d at 106 n.4 (citing in turn Minn. Stat. § 3.736, subd. 9 (1990) pertaining to state employees); <u>see</u> <u>Freier</u>, 356 N.W.2d at 731 (applying statutory immunity to members of governing board charged with making employment decisions). Similarly, a municipality is required to indemnify its officers and employees (elective or appointive) except in the case of "malfeasance in office, willful neglect of duty, or bad faith." Minn. Stat. § 466.07, subdiv. 1(1).

As noted previously, Erar's tortious interference claim against Jacobson, Knight and Trude requires proof of actual malice. A finding in his favor against a defendant would be tantamount to a finding that defendant acted in bad faith and outside the scope of his or her duties as a councilmember. Presumably the City would not be obligated to indemnify the defendant and, it follows, the defendant would not  be entitled to statutory immunity.

The "official immunity" alternative noted in <u>Watson</u> would be equally unavailing.[10] Official immunity is "a common law remnant of sovereign immunity. It operates to protect individuals who may be subject to liability due to their work or engagement on behalf of the government." <u>Davis</u>, 559 N.W.2d at 122. Unlike statutory immunity, official immunity is not absolute. It "will not protect an individual official who commits a malicious or willful wrong." <u>Id.</u>

The parties have not addressed the City's duty to indemnify the tortious interference claim against the councilmember defendants and the effect of that duty, or absence thereof, on statutory immunity. It is incumbent on defendants to demonstrate that they are entitled to judgment as a matter of law and they have not to this point done so on the ground of statutory immunity.

**B.      Due Process Claim**[11]

Erar's § 1983 Due Process claim is based in part on an allegation that the City deprived him of a constitutionally protected property interest in continued employment. (Second Amended Complaint ¶ 63(c)). Defendants move for summary judgment on this aspect of the claim.

Property interests are created by "existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." <u>Board of Regents v. Roth</u>, 408 U.S. 564, 577 (1972). A public employee has such an interest in his or her employment if the employee may not be terminated except for good cause. <u>Cleveland Bd. of Education v. Loudermill</u>, 470 U.S. 532, 538-

---

[10] Defendants do not predicate the motion on official immunity.

[11] Viewed as a type of wrongful termination the Minnesota courts might have found they lacked jurisdiction over Erar's § 1983 claim because of the certiorari-only rule. The absence of state court jurisdiction, however, does not diminish this Court's original jurisdiction of a § 1983 claim alleging a violation of federal constitutional rights. <u>See</u> <u>Charchenko v. City of Stillwater</u>, 47 F.3d 981, 984 (8th Cir. 1995).

39 (1985). At-will public employees do not have a protected property interest in continued public employment. Eddings v. City of Hot Springs, Ark., 323 F.3d 596, 601 (8th Cir. 2003); Somers v. City of Minneapolis, 245 F.3d 782, 785 (8th Cir. 2001); cf. Singleton v. Cecil, 176 F.3d 419, 428-29 (8th Cir.), cert. denied, 528 U.S. 966 (1999)(discussing "occupational liberty" interest in relation to procedural due process).

Defendants contend Erar had no property interest in continued employment because his employment contract with the City, approved unanimously by the city council, expressly provided that he would "serve at the will of the Council and may be terminated with or without cause at any time." (Dickinson Aff., Ex. C).

Erar's employment contract unambiguously provided that his employment was at will. The contract terms were negotiated. (Erar Depo. at 102). During his employment Erar understood that the employment relationship was at-will, which is usually the case with city managers in Minnesota. (Id. at 119-20). Following Erar's termination the City paid the severance benefits to which Erar was entitled under the employment contract and his separation agreement.

Erar argues that, not withstanding his contract, Ordinance No. 216 and the personnel policy mandated he could only be discharged for "just cause" thus giving rise to a protected property interest. The ordinance provided that the City Administrator could be removed from office only by a majority of the City Council "in accordance with the rules and procedures set forth in the City's personnel policy." (Dickinson Aff., Ex. A at A00454). The personnel policy allowed dismissal of employees "for just cause only." (Id., Ex. G at A00473). The policy did not apply to positions designated by the City Council and the City Council reserved the right to modify the policy as

needed. (Id. at A00472). As the City Administrator Erar was familiar with both Ordinance No. 216 and the personnel policy. (Bettison Aff.; Erar Depo. at 92-93, 129-30, 132).

Defendants maintain that the termination provisions of Erar's employment contract effectively designated him as not covered by the personnel policy, or modified the policy's termination provision with respect to Erar. The Court agrees. It is undisputed that Erar and the City negotiated an express contract under which Erar could be terminated with or without cause. Both the City and Erar understood and agreed that the employment relationship was at-will. The employment contract contractually modified the termination provision in the personnel policy by making it inapplicable to Erar, and the contract effectively designated him as an employee to whom the provision did not apply. Erar points out that a contract that violates law or public policy is void. True, but nothing in the ordinance, personnel policy, or public policy of Minnesota as far as the Court can tell restricted the parties' freedom to enter into a contract with terms and conditions of employment different than those stated in the City's personnel policy for employees generally, particularly given the City Administrator's unique role as chief administrative officer of the city. For the consideration promised in his employment contract, including specifically the severance compensation in the event of a discharge without cause, Erar gave up any property interest in continued employment he might otherwise have had.

The motion for summary judgment should be granted on the Due Process claim (Count III) to the extent based on a deprivation of a constitutionally protected property right.[12]

---

[12] Erar notes that after his employment ended the City amended Ordinance No. 216 to designate the City Administrator's position as at-will. (Pl. Supp. Ex. 33). The Court does not believe the post-litigation amendment to the ordinance is of any significance in analyzing the Due Process claim.

C.      **Minnesota Government Data Practices Act Claim (MGDPA)**

Erar contends the City, through Trude, released private data to city staff members and private citizens in violation of the MGDPA. Defendants move for summary judgment on the ground that the statements attributed to Trude either did not reveal private data, or revealed public data. As there is no dispute for summary judgment purposes about what Trude said, the question is one of law. Navarre v. So. Washington Co. Schools, 652 N.W.2d 9, 22 (Minn. 2002).

> The Minnesota Government Data Practices Act "regulates the collection, creation, storage, maintenance, dissemination, and access to government data" and "establishes a presumption that government data are public and are accessible by the public for both inspection and copying."

Id. (quoting Minn. Stat. § 13.01, subd. 3). The act defines "personnel data" as "data on individuals collected because the individual is or was an employee of," in this case, a "political subdivision." Minn. Stat. § 13.43, subd. 1. All personnel data not identified as "public data" in the statute are private data. Navarre, 652 N.W.2d at 22. As relevant here, public data includes:

> (4) the existence and status of any complaints or charges against the employee, regardless of whether the complaint or charge resulted in a disciplinary action;
> . . . .
>
> (8) payroll time sheets or other comparable data that are only used to account for employee's work time for payroll purposes. . . .

Minn. Stat. § 13.43, subd. 2(a)(4)(8).

The MGDPA is not very definitive on what constitutes "data." The Minnesota Court of Appeals has said that data "means information and can refer to information in any form." Keezer v. Spickard, 493 N.W.2d 614, 617 (Minn. App. 1992). That court recognized that taken literally, this definition could include knowledge that existed only in the mind of a government employee. The

Keezer court believed the Minnesota legislature could not have intended that result. It reasoned, "[i]nterpreting 'government data' to include mental impressions formed by public employees during the course of employment would lead to absurd results." 493 N.W.2d at 617. To give effect to this construction the court concluded information is not government data "until the information is recorded somewhere other than the human brain." Id. at 618. Thus, to prove a violation of the act, the plaintiff must show "the information released was recorded somewhere other than in the mind of a government employee . . . [t]he plaintiff must point to an actual record whose contents have been disseminated to give rise for improper release of government data under the Act." Id.

In Navarre the Minnesota Supreme Court agreed with the court of appeals' analysis concerning unrecorded mental impressions.

> . . . Because an individual's mental impressions cannot be inspected or copied, it follows that they do not constitute government data and therefore are not personnel data. Accordingly, disclosing such mental impressions to the public does not violate the MGDPA.

652 N.W.2d at 25. In doing so, however, the supreme court qualified the mental impressions rule in the case of complaints or charges against an employee. The Navarre court had held that while "the existence and status of any complaints or charges" is public data under § 13.43, subd. 2(4), any disclosure during an investigation that described the "quality or characteristic of the complaint" beyond its mere existence violated the Act. Id. at 23. Apparently to give effect to this limitation, the court also held that

> . . . pending final disposition of any disciplinary action, the disclosure of mental impressions derived directly from personnel data recorded in some physical form or storage media, or derived directly from complaints or charges against the employee, is private data on individuals.

Id. at 25. What constitutes cognizable "complaints or charges" within the meaning of the statute was

24

not addressed in <u>Navarre</u>. The context of the court's discussion, however, suggests something more than disagreement or dissatisfaction with a public official's job performance is required, sufficiently definite and of a nature to warrant some kind of an investigation or disposition.

The disclosures made by Trude alleged by Erar to have violated the MGDPA are as follows:

> (a)     On April 5, 2004 Trude told Pat Janssen ("Janssen")[an administrative secretary in Erar's office] that she was concerned that Erar was not following up on several points regarding the Community Center because of his impending termination of employment. Trude further informed Janssen that the City Attorney was currently drafting a severance agreement, and that she had already spoken with Fire Chief Dan Winkel in regards to Erar's termination of employment. (Erar Dep. at 256).

> (b)     Trude contacted Tom Berard, President of the Andover Athletic Association and made the following statements, including: [1] "We have disagreements with the administrator's way of thinking on a number of critical issues going back to location. [2] He [Erar] saw this as 'cheap site' b/c of the sewer/water access. [3] He is not one who understands the shortage of play fields in this city -- never having been a sideline dad b/c he was a workaholic. [4] Now he's biding time looking for a better job where he can run the council and staff w/o accountability to constituent interests -- [5] he's taken over 10 weeks off (full weeks) in the past year and missed vital meeting involving the council and Y." (Fabian Aff. Ex 23).

(Pl. Memorandum at 27).

With respect to the statements to Janssen, Erar complains Trude improperly disseminated information concerning the termination of his employment, and her concern that Erar was not following up on matters involving the community center related to and went beyond the status of complaints or charges against him.

The Court agrees with defendants that Trude's concern about Erar's follow-up on the

community center project was no more than her own mental impressions, was not either government data or personnel data within the contemplation of the MGDPA, and was not derived from any existing complaint or charge against Erar. If Erar's view of what constitutes a complaint or charge under the MGDPA were accepted, an elected official in Trude's position would be severely limited in publicly criticizing the job performance, policies and practices of the person charged with managing the City's business. The Court doubts the Minnesota legislature would have intended such a restriction.

As to Erar's termination, it is evident that Trude, Jacobson and Knight, a majority of the city council, wanted Erar fired, had communicated on that subject, and indeed by April 1, 2004 had told City Attorney Hawkins of their intent. Hawkins had told Erar he would be willing to negotiate a separation agreement. However, to that point there had not been a city council meeting concerning Erar's performance or possible termination. As of April 5, 2004 the city records contained no data indicating that Erar was going to be terminated. (Dickinson Aff. ¶ 7). There is no evidence the defendants' intent to terminate Erar had been recorded anywhere other than in the minds of the three councilmembers concerned and that of the City Attorney to whom the intent had been communicated. Trude's statement about Erar's termination was therefore not government or personnel data.

Turning to Trude's statements to Berard, her disagreement with Erar's thinking on a number of issues, her characterization of his view of issues and opinions about the reasons for them (item numbers [1] - [4] in the quote) are also clearly mental impressions and opinions incapable of being

"inspected or copied" and therefore not government or personnel data. <u>Navarre</u>, 652 N.W.2d at 25.

They do not relate to any specific complaint or charge then under investigation.

The disclosure that Erar had taken over ten weeks off from work in the past year was a disclosure of personnel data, but it was public data under Minn. Stat. § 13.43, subd. 2(a)(8). Trude's statement concerned vacation leave and compensatory time off taken by Erar. She appears to have obtained the information from payroll records maintained by the City's Finance Director. In <u>Navarre</u>, a teacher claimed that a school superintendent's letter to staff stating that he had "placed a teacher on paid leave until the end of the school year" violated the MGDPA. The teacher had been placed on medical leave. The Minnesota Supreme Court held that the statement was public data under § 13.43, subd. (2)(a)(8).

> . . . We hold that this information is encompassed within the statutory "comparable data . . . used to account for employees' work time for payroll purposes" which here was a paid leave -- that is an absence from work coupled with an expenditure of public funds for payroll purposes.

652 N.W.2d at 23. If the fact a public employee has been placed on leave is public data under the MGDPA, the amount of paid vacation leave and compensatory time off taken by an employee should likewise be public data. The information relates to "an absence from work coupled with an expenditure of public funds for payroll purposes." Put another way, if the payroll records or other comparable data reflecting Erar's absence from work are public data, Trude's disclosure of what the payroll records showed is also public data.

27

**IV.**

**RECOMMENDATION AND ORDER**

For the reasons discussed above, the undersigned respectfully recommends that defendants' motion for partial summary judgment be **granted in part** and that the following claims in the Second Amended Complaint be dismissed: Counts IV, VI and the claim in Count III of a Due Process violation attributable to deprivation of a property interest. The motion should be **denied** with respect to the tortious interference claim (Count I).

The Court will extend the time for objections provided in LR 72.1(c)(2). IT IS ORDERED that the parties have until **May 13, 2005,** to file written objections to this Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1). Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990). Any objections filed must identify the specific portions of the Report and Recommendation and set forth the basis for such objections. See Fed. R. Civ. P. 72; Thompson, 897 F.2d at 357. Failure to timely file objections may constitute a waiver of a party's right to appeal questions of fact. Thomas v. Arn, 474 U.S. 140, 155 (1985); Thompson, 897 F.2d at 357.

IT IS SO ORDERED.

Dated this 22nd day of April, 2005.

ROSS A. WALTERS
UNITED STATES MAGISTRATE JUDGE
(By assignment and order pursuant to
  28 U.S.C. § 636(f))