# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

John Erar,

      Plaintiff,

v.

City of Andover, a Minnesota municipal
corporation, and Don Jacobson, Mike Knight
and Julie Trude, individuals,

      Defendants.

**REPORT AND
RECOMMENDATION
CONCERNING DEFENDANTS'
JULY 18, 2005 MOTION FOR
SUMMARY JUDGMENT**

Court File No. 04-3742 HDV/RAW

---

Before the Court is defendants' motion for summary judgment [135], filed July 18, 2005, the second summary judgment motion filed by defendants. Plaintiff John Erar was the City Administrator for the City of Andover, Minnesota. His employment was terminated in April 2004 at the instance of City Councilmembers Don Jacobson, Mike Knight and Julie Trude. In his Second Amended Complaint Erar brings six causes of action:  against the individual defendants under Minnesota common law for tortious interference with contract and prospective economic relations(Count I); against the individual defendants for violations of Minnesota's Open Meeting Law, Minn. Stat. § 13D.01, *et seq.* (Count II); against all defendants under 42 U.S.C. § 1983 for violations of his rights under the Free Speech Clause of the First Amendment and the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution (Count III);[1] against the City for violations of the Minnesota Government Data Practices Act (MGDPA), Minn. Stat. § 13.43, *et seq.* (Count IV); against the City for violations of Minnesota's Whistleblower statute, Minn. Stat. § 181.932 (Count V); and against the City for breach of contract (Count VI). This action was

---

[1] As argued by Erar, the remaining Due Process claim that he was deprived of a liberty interest without procedural Due Process is only against defendant Trude. (Pl. Memo. at 39-45).

originally filed in Minnesota state court and removed to this Court. The Court has federal question jurisdiction of the federal civil rights claims, 28 U.S.C. § 1331, and supplemental jurisdiction over the state law claims, 28 U.S.C. § 1367(a).

On October 29, 2004 defendants moved for partial summary judgment on Counts I, IV, VI and the § 1983 Due Process claim in Count III  to the extent based on deprivation of a property interest in continued employment. That motion, like the present motion, was referred to me for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). In a Report and Recommendation ("R&R") filed April 22, 2005 I recommended that the motion for partial summary judgment be granted in part. I recommended that Counts IV, VI and the Due Process claim in Count III based on deprivation of a property interest be dismissed. I recommended that the motion with respect to the tortious interference claim in Count I be denied. Defendants objected to the recommendation that the motion be denied on Count I. The April 22, 2005 R&R is pending. The present motion for summary judgment is directed at all of the remaining claims (except one alleged Open Meeting Law violation), including the sufficiency of the evidence to support the tortious interference claim pleaded in Count I.[2]

The present motion came on for oral argument on September 8, 2005.  It is fully submitted. For the reasons stated below, I recommend that summary judgment be granted on the remaining § 1983 federal constitutional claims. If this recommendation is adopted, and the recommendation in the April 22, 2005 R&R for dismissal of the alleged Due Process violation based on deprivation of a property interest is adopted, all claims over which this Court has original jurisdiction will have

---

[2] Defendants' first motion for summary judgment presented only a question of law with respect to the tortious interference claim. (April 22, 2005 R&R at 12-18).

been dismissed. In that event, I further recommend that this Court decline to further exercise supplemental jurisdiction with respect to the state law claims in Counts I, II, and V of the Second Amended Complaint, that the Court not act further on the April 22, 2005 R&R concerning Count I, and that the claims in said counts be remanded to the Minnesota District Court, Tenth Judicial District, County of Anoka. 28 U.S.C. § 1367(c). Accordingly, I have not addressed the merits of the present motion on those counts.

It is not necessary to again set out the factual underpinnings for the claims and defenses except as they bear specifically on the federal claims. Nor is it necessary again to articulate the applicable standard by which a summary judgment motion is determined. Accordingly, Parts I and II (captioned respectively "Summary Judgment" and "Factual Background") of the April 22, 2005 R&R are incorporated herein by reference. This R&R should, in any event, be considered together with the April 22, 2005 R&R.

# I.

## THE FEDERAL CONSTITUTIONAL CLAIMS

### A.     First Amendment

Erar alleges his First Amendment Free Speech rights were violated when he received adverse performance evaluations from the Councilmember defendants and his employment was terminated in retaliation for speaking out on matters of public concern. He bases his claim on six instances of asserted protected speech: (1) speech concerning the Kellogg e-mail incident; (2) speech concerning the "design-build" dispute; (3) speech concerning defendant Knight's potential conflict of interest; (4) a January 31, 2003 memo to the City Council and related speech responding to allegations about Erar made at a City Council meeting by Councilmember Trude; (5) speech concerning the alleged

"Greenhaven Open Meeting Law violation;" and (6) speech concerning a private developer's contribution to public road improvements in connection with the "Clocktower Commons" project.

1.     Factual Background

The facts discussed below are either undisputed or are as viewed favorably to Erar.

a.     The Kellogg E-Mail

On July 13, 2002 Frank Kellogg, an Andover resident who chaired the Sports Complex Task Force involved in planning for the construction of a community center, responded to an e-mail from Councilmember Trude. In it he expressed the belief that the community center project should be put on a fast track, adding "the Council needs to understand that if the timeline is to [sic] long than [sic] a private group may intervene and build all or part of the facility. I believe that there are additional dollars to possible [sic] obtain as well if, we get creative but we may need to return favors with a major developer." (Pl. Ex. 25).[3]  In addition to Trude, Kellogg sent the e-mail to Mayor Mike Gamache and Councilmembers Knight and Orttel. Two days later Gamache told Erar about the e-mail and expressed concern about it. Erar asked his secretary for a copy of the e-mail which she obtained from the City's e-mail server. The e-mail was a potential problem for the City for two reasons, the second exacerbating the first. In suggesting the need for "creative" financing and extending favors to a major developer, the e-mail hinted at a shady *quid pro quo* arrangement. Moreover, there was a question about whether the e-mail was "public data," that is, a public record available to the public under the MGDPA. Erar promptly called City Attorney William Hawkins on

_____

[3] The parties' summary judgment exhibits are attached to the affidavits of counsel. To more clearly identify the exhibits, those attached to the affidavit of plaintiff's counsel are referred to as "Pl. Ex. __" and those attached to the affidavit of defendants' counsel are referred to as "Def. Ex. __." References in the text to depositions are to the deponent and page number. The depositions are also exhibits to the affidavits of counsel.

the phone to discuss three issues concerning the e-mail. He was concerned that Councilmember Jacobson had not received a copy of the e-mail, he was concerned about the suggested *quid pro quo* arrangement, and he discussed with Hawkins whether the e-mail was private or public data under the MGDPA. (Erar Dep. at 267-69).  There is a dispute about what Hawkins initially told Erar on the subject of whether the e-mail was a private or public communication, however, according to Erar, Hawkins "affirmed my belief that the e-mail was indeed a public communication and he confirmed that in his opinion it was most likely public." (Id. at 270-71).

After speaking with Hawkins, Erar recommended that Councilmembers distance themselves from the suggestion in Kellogg's e-mail. When he spoke with Trude, Erar told her that Hawkins had opined the e-mail was public data under the MGDPA. This prompted Trude to, on July 15, e-mail Kellogg telling him her ethics were offended by his reference to a "creative way" to obtain funds. She said Erar had told her Kellogg's e-mail was a public record and he had been in communication with the City Attorney about it. Trude told Kellogg she "shared with [Erar] my total outrage and anger that anyone would suggest" that elected officials make decisions on any basis other than the "highest ethical standards which preclude any exchange of favors for public benefit." She concluded by suggesting Kellogg resign from the task force. (Pl. Ex. 29). About an hour later Trude sent a second e-mail to Kellogg with a prefatory request that he not show it to anyone and delete it. She described her conversation with Erar earlier in the afternoon. She noted that Erar was disturbed by the content of Kellogg's e-mail and had spoken to the City Attorney. Trude wrote  she "was PO'd that he [Erar] was taking it to this level b/c I believed it was personal."[4]

---

[4] Kellogg protested in a responsive e-mail to Trude and Erar that he was only advocating "out of the box" thinking and did not mean to suggest anything illegal or dishonest. (Def. Ex. 23).

The next day, July 16, Trude spoke with Hawkins about whether the Kellogg e-mail was public. Hawkins told her his initial reaction had been that the communication was public but, after having done some research, he felt the communication was a private communication. (Hawkins Dep. at 23). Trude has testified Hawkins was adamant he had never said the Kellogg e-mail was public, nor did he tell Trude he had told Erar his initial reaction was that the e-mail was public. (Trude Dep. at 106-07, 141).

At a City Council meeting on the evening of July 16 Hawkins informed Erar of his opinion that the Kellogg e-mail was a private communication. (Hawkins Dep. at 40). Erar believed Hawkins had changed his opinion and was not convinced. He told Hawkins about a League of Minnesota Cities training session he had recently attended which dealt with the subject of public/private data under Minnesota law. Erar contacted legal counsel to the League who initially opined Kellogg's e-mail was a public communication, but later said he would defer to Hawkins' opinion. Erar also talked to the City Clerk (the Council-designated data privacy person) and the City's Human Resources Manager who had experience in data practices. All of these contacts confirmed Erar's opinion that the e-mail was public. (Erar Dep. at 280-82).

Apparently at Erar's request the League of Minnesota Cities provided Hawkins with information. After reviewing that information, and other materials, on July 18, 2002 Hawkins put his opinion in writing in an e-mail to Erar. He advised that Kellogg's e-mail was private under Minnesota law and offered to submit the question to the Minnesota Department of Administration for an advisory opinion. (Def. Ex. 26).

Reassured by Hawkins that Kellogg's e-mail was a private communication, on July 16 Trude sent an e-mail to Kellogg retracting her recommendation that he resign from the task force. Trude

sent a copy to Erar which prompted him to explain the reasons for his reaction to Kellogg's e-mail. He wrote to Trude on July 17 that he had advised the City Council as he did to reduce the damage that could result from public disclosure of the e-mail, adding "[a]s your City Administrator, I would be negligent not to alert you to a situation that could jeopardize the standing of the Council." (Def. Ex. 24). Trude was not mollified. On the morning of July 18 she e-mailed Erar accusing him of misrepresenting Hawkins' legal opinion. (Pl. Ex. 31). She suggested he drop the matter and "not fight your elected officials on it and generate unwanted publicity and illwill amongst us." (Id.) Trude followed that e-mail with a second e-mail on the afternoon of July 18 in which she asked Erar to destroy the Kellogg e-mail, delete it from his computer, and not talk about it or publish the content of the communication in any way. (Pl. Ex. 32). Erar promptly responded by e-mail, with a copy to Hawkins, that he had spoken to Hawkins who had advised him not to destroy or delete documents from the City's e-mail system. Apparently referring to Hawkins' e-mail legal opinion which had been sent to him only about an hour before (Def. Ex. 26), Erar added that Hawkins and he believed the issue should be submitted to the Minnesota Department of Administration for an advisory opinion. However, in light of Hawkins' opinion, he said he would not disseminate the e-mail or documents associated with it and they would be kept confidential until further notice. (Pl. Ex. 32).

Later in the afternoon of July 18, Erar e-mailed Trude a more lengthy response to her complaint about misrepresentation of Hawkins' opinion. He said it was still his opinion that Kellogg's e-mail was a public communication, and that he was willing to submit it to the Department of Administration.  He denied an intent to deceive and said he resented the implication he had done so. He continued that he could "hardly believe" Trude had attacked his character, ethics, honesty and professionalism. He added:

> Your comment about fighting the elected officials on this matter is absolutely incredible! You are making me feel like a "whistleblower" when my only intention was to advise the Council on the damaging nature of this item.

(Pl. Ex. 34). Erar also expressed disagreement with what he saw as Trude's position "that as long as this email is private, the council shouldn't have to worry about or take any action to distance themselves from it." (Id.)

On July 19 Erar sent an e-mail to Kellogg explaining his position in the dispute over the e-mail. He told Kellogg: "My main concern, as the City Administrator, is to preserve the integrity of the City, the Council and the project." (Def. Ex. 29).

Councilmember Knight also became involved in the dispute. Knight too felt Erar had misrepresented Hawkins' opinion. Knight received a call from Kellogg who was angry and wanted to know "why city hall was reading his e-mails." (Knight Dep. at 65). Knight testified he contacted Hawkins who told him the communication was private, contrary to what Knight understood Erar had said about Hawkins' opinion. (Id. at 65-66). Knight subsequently contacted Erar and told him to leave the e-mail issue alone. (Id. at 154-55).

Erar ultimately deferred to Hawkins' legal opinion that the e-mail was a private communication. Nothing came of Kellogg's *quid pro quo* suggestion and no one outside city government became aware of the e-mail. It is evident the e-mail resulted in a deterioration in the opinions of Trude and Knight concerning Erar's performance. In her April 2003 evaluation of Erar (dated March 31, 2003) Trude wrote she felt Erar had "breached his trust" with the City Council. She cited the Kellogg e-mail episode as an example of how Erar's conduct had been detrimental to working relationships with some of the Councilmembers. (Def. Ex. 38 at JT00061). In his evaluation for the same time period Knight gave Erar a rating of "below expectations" in the area of

"Relationship with Council," an area he viewed of "particular concern." He wrote that "[o]n two occasions I have had the position/opinions of the city attorney misrepresented to me. In both cases 'being right' seemed to be the overwhelming motivation." (Def. Ex. 39 at A00264, 270).

   b.  "Design-Build"/OPUS

   Knight advocated the "design-build" option in discussions concerning the methodology to be used to construct the proposed community center. A design-build project is one in which a single firm is hired without competitive bidding to both design and build a project. (Erar Dep. at 298). Knight's promotion of the design-build option brought him into conflict with Erar, who told him that the design-build method would violate Minnesota law. According to Erar, in several meetings Knight tried to convince the City Council of the benefits of the design-build option, and said the City Attorney had told him design-build arrangements were legal. (Id. at 302). Erar asked Hawkins about it, who told him that he (Hawkins) had not spoken with Knight on the issue. (Id.) Erar asked Hawkins for a written opinion. Hawkins responded on September 25, 2002. He wrote that design-build agreements did not present legal problems as long as the competitive bidding requirements of Minnesota law were followed. (Def. Ex. 31). The hiring of a construction manager or design company did not require competitive bidding because those were professional services, but the actual construction portion of the project did. Though having the same entity design, and then bid and build the community center, the so-called "design-bid-build" option, did not violate the law, Hawkins cautioned against it because of the risk of litigation from disappointed bidders and the appearance of a potential conflict of interest "where one firm designs, builds and inspects a public project." (Id.) Erar distributed Hawkins' opinion to the City Council.

For a time Knight remained skeptical that design-build was unlawful. Knight believed the design-build approach would save money, and told Hawkins he thought the University of Minnesota and some other public entities had selected companies to both design and then build projects without competitive bidding. (Hawkins Dep. at 53). Hawkins told Knight that under the law applicable to municipalities the construction portion of the project had to be bid. (Id.)

At a City Council workshop on October 9, 2002 Knight appears to have referred to specific public entities he thought may have entertained construction projects on a design-build basis. The City Council requested Erar's staff to research the examples referred to by Knight. On November 13, 2002 Erar provided the City Council with the results of his inquiries. They indicated that in each case cited by Knight the project was not a municipal project or had not been constructed on a design-build basis. (Pl. Ex. 37 at JE000055-57). Erar recommended that the Council direct the staff to prepare separate Requests for Proposals (RFP's) that "would allow one firm or two firms, as a team, the opportunity to submit proposals for dual services on the project for both construction management and design services." (Id. at JE000058). Erar contends Knight and Trude were angry with the report, however, they along with the other members of the City Council voted to approve Erar's recommendations. (Def. Ex. 33 at A01432).

Following the adoption of Erar's recommendations, the City prepared separate RFP's for the community center architect and construction manager. The City also established an RFP review committee to interview those submitting proposals.

       c.       Knight's Conflict of Interest

Knight was the City Council's representative on the RFP review committee. (Erar Dep. at 122). At committee meetings Knight promoted OPUS to both design and construct the project.

OPUS was in the business of providing architectural and construction services. Knight, whose former son-in-law Leith Dumas was a senior project manager for OPUS, had in September of 2002 been in contact with Dumas concerning OPUS' ability to perform the project on a design-build basis. (Pl. Ex. 44; Knight Dep. at 19). Members of the review committee commented to Erar questioning why Knight promoted OPUS. (Erar Dep. at 320). At a committee meeting Knight said something about an extended family member, former son-in-law, or personal friend working at OPUS, and Knight admitted someone at OPUS had been giving him information. (Id. at 321). Erar approached Hawkins, telling him he had heard Knight had a relative who worked for OPUS. (Id. at 321; Hawkins Dep. at 56). Erar asked if that would constitute a conflict of interest for Knight. In the absence of any financial gain to Knight from the selection of OPUS, and in view of the apparent remoteness of the connection, Hawkins did not think there was a conflict of interest and so informed Erar. (Hawkins Dep. at 56).

Hawkins later told Knight that Erar had raised the question about a possible conflict of interest because of a relative working for OPUS. (Hawkins Dep. at 57). Knight confronted Erar and, according to Erar, was very upset about the fact Erar had raised the question with the City Attorney instead of approaching him directly. (Erar Dep. at 321; Pl. Ex. 26 at 8). Knight admitted his anger, and that he expressed it to Erar. (Knight Dep. at 24).

The RFP review committee ultimately made recommendations "on both separate contracts for architects and construction managers and also for joint proposals." (Pl. Ex. 43 at A01611). The committee voted 6-1 against OPUS' joint service proposal, and recommended another firm. (Id. at A01612). The committee also recommended firms (again other than OPUS) in the event the City Council opted for separate firms to act as architect and construction manager. (Id.) The committee

presented its recommendations at a City Council workshop on February 25, 2003. Trude made a motion, seconded by Knight, that the Council set up interviews with the recommended firms, plus OPUS, to obtain answers to questions she and Knight had. (Id. at A01613). Councilmember Orttel questioned the motion, made a statement about Knight having a friend at OPUS and said if that was the case, the Council should not be looking at OPUS. (Knight Dep. at 216). According to the meeting minutes, Knight denied he had spoken to anyone at OPUS. (Pl. Ex. 43 at A01614). He said he had checked with the City Attorney who had found no conflict of interest, and Erar had been told the same thing by the City Attorney. (Id.; Knight Dep. at 216-17). The motion was rejected, with Knight abstaining. (Pl. Ex. 43 at A01615). After further discussion, the recommendations of the committee with respect to separate architectural and construction management contracts were agreed to with all Councilmembers voting in favor except Knight. (Id. at A01616).

> d.      Erar's January 31, 2003 Memorandum to the City Council (Pl. Ex. 38)

Erar thought that Trude inappropriately injected herself into the work of the RFP review committee in interviewing prospective architects and construction managers. In so many words he told her so at a committee meeting which, while Trude was not on the committee, she attended and expressed her opinions concerning the selection process. Trude was offended and at a City Council meeting on January 21, 2003 complained publicly she had been rudely treated by Erar. (Pl. Ex. 39 at A01582-83). Erar's January 31, 2003 memorandum was his response to Trude's allegations and expressed his concerns about Trude's behavior. (Pl. Ex. 38). Some additional detail is appropriate in order to understand the dispute.

Knight was a member of the committee, but not Trude. Trude attended some of the interviews. (Trude Dep. at 220-22). She appeared at a January 16, 2003 committee meeting saying

she intended to participate as an observer. (Pl. Ex. 38 at JT00200). Shortly after the session began Trude interrupted Erar and started going into what Erar considered to be political issues. (Erar Dep. at 326). After a few minutes Erar intervened. He told Trude the committee needed to move on with its work, which was not political and limited to selecting the best firm or firms to recommend to the Council. (Erar Dep. at 326; Pl. Ex. 38 at JT00200-01). Erar recalls Trude became upset, threw her papers on the table and stormed out of the room. (Erar Dep. at 326).

On January 18 and 19, 2003 Trude left messages for Erar demanding access to the RFP's and complaining about Erar's "harassing her behind her back." (Pl. Ex. 38 at JT00201).

On January 21, 2003 Trude visited City Hall with Andover resident Tony Howard to review the RFP's. Because of Howard's presence and the private nature of the RFP's,[5] Erar asked the City Clerk to sit in, which had been the City's practice when files are reviewed by a member of the public. (Pl. Ex. 38 at JT00201). This did not go over well with Trude. She was concerned about why the Clerk had to "babysit that process." (Trude Dep. at 247). Though present, Howard did not view the RFP's.

On the evening of January 21, 2003 the City Council met. Near the conclusion of the meeting Trude complained about the way she had been treated by Erar at the RFP review committee meeting. She said Erar had solicited opinions, yet when she commented that the committee should look at the budgets in the proposals Erar rudely interrupted her and told her she was being political in a situation where politics did not apply. (Pl. Ex. 39 at A01582). Trude apparently also expressed her objection

---

[5] The proposals submitted by the various firms are often referred to in the record as simply the "RFP's." (See, e.g., Pl. Ex. 38 at JT00201).

to the City Clerk's presence earlier in the day when she reviewed the RFP's with Howard in the room. (Id.; see Pl. Ex. 38 at JT00201).

Erar denied he had been discourteous to Trude and said she had been making statements to the committee concerning political aspects of the community center decision which he told Trude were not a part of the committee's concerns. (Pl. Ex. 39 at A01582-83).

Erar responded more fully to Trude's allegations in the January 31, 2003 memorandum to the Mayor and City Council. He repeated what he had said at the January 21 meeting, denying he had been rude to Trude and giving his version about what had occurred. According to Erar, Trude complained he had "stacked" the committee and she would be "personally disappointed" if a certain consultant were not selected for an interview, which Erar took as a "not so subtle warning." (Pl. Ex. 38 at JT00200). Among the political comments Erar found objectionable were those that informed the committee they should be sensitive to community politics and if the budget was too high, that would create problems for her and the City Council which might doom the project. (Id. at JT00201). Erar wrote that when he suggested to Trude that the committee should not be making political judgments, Trude "became visibly upset, claimed that she was being 'disrespected to,' stood up and abruptly left the room." (Id.)

Erar responded to Trude's comments which he viewed as suggesting he had impeded her ability to gain access to RFP proposals.  He denied taking any action to deny Trude access to the RFP's and, with respect to the Howard episode, said he had merely been following established City practice in having the Clerk present. (Id. at JT00201-02).

Erar wrote that  he viewed Trude's allegations "as a clear attempt of retaliation intended to publicly damage my reputation and create an environment of intimidation and distrust of staff." (Pl.

Ex. 38 at JT00202). Erar said it had come to his attention Trude approached City staff after the January 16 committee meeting and told them he had treated her rudely. He complained this discredited him in front of staff members, undermined his position as the chief administrative officer, and created an intimidating work environment. (Id.)

Erar next expressed concern that Trude's behavior threatened the confidentiality of the RFP's, what he referred to as "Data Privacy Concerns." (Pl. Ex. 38 at JT00202). He said he received a call from a representative of E & V Consultants who told Erar that after his interview by the committee Trude had approached him in the hallway and "demanded" a copy of E & V's proposal. (Id.) The representative told Erar the demand made him and others with him uncomfortable. Erar wrote that this kind of situation could lead to legal challenges to the selection process, (id.) a risk heightened by Trude's political motivations and "strong disposition" to favor a particular consulting firm, presumably OPUS. (Id.)

Erar reported a second incident in which he felt the confidentiality of the process was at risk. He said that in front of several members of the interview panel Trude asked the consultant from OPUS to provide a copy of its RFP to Mr. Howard. Erar said Trude had improperly used her position as a Councilmember to secure the release of private information. (Pl. Ex. 38 at JT00202-03).

Finally, Erar wrote that the public comments made by Trude had compelled him to document the issues addressed in his memorandum "not only to protect my reputation against these untrue statements, but to advise the City Council of potential liability and/or lawsuits from consultants who may challenge the City's selection process." (Pl. Ex. 38 at JT00203). Erar revealed he had agonized over whether to write the memorandum and recognized it might imperil his position with the City

"and create further divisiveness between my office and CM Trude." (Id.) He said he had chosen to write the memorandum to defend his office from what he believed were Trude's "baseless, retaliatory allegations." (Id.)

On February 19, 2003 Trude responded to Erar's January 31, 2003 memorandum with a memorandum of her own to the Mayor and City Council. (Pl. Ex. 42). She disputed Erar's version of the underlying events in many particulars and dismissed his concerns about the incidents which he felt threatened the privacy of the RFP selection process. She summarized the effect of the dispute on her relationship with Erar:

> I had trusted that Erar would communicate with me in an open and honest fashion, not by memo to my peers, and not to staff through meetings. City Administrator Erar has breached this trust. He has interfered with my ability to carry out my duties as an elected official in Andover. His memo of 1/31/03, has taken it one step beyond interference to an outright attack on my character and integrity. His attacks have no basis in fact or the law; they are entirely personal and slanderous.

(Id. at JT00161).

e.      Greenhaven Open Meeting Law Violation

On September 19, 2003 the City hosted a golf outing and dinner at the Greenhaven Country Club in Anoka, Minnesota. Erar and the Councilmembers were present. Erar and Mayor Gamache have testified they observed Councilmembers Trude, Knight and Jacobson speaking together in the parking lot after the event. (Erar Dep. at 379; Gamache Dep. at 87-88). Neither Mayor Gamache nor Erar could hear the conversation, but Erar has testified from the suspicious way they were acting he could tell Trude, Knight and Jacobson were talking about something having to do with City business. (Erar Dep. at 377-79). Later Jacobson admitted to Erar that the three had been discussing the Slyzuk land purchase deal which involved ground for the community center. (Id. at 378).

16

Erar did not communicate to Trude, Knight or Jacobson any concern about the propriety of their discussion of the Slyzuk land deal outside a City Council meeting. (Erar Dep. at 380). He did, however, tell City Attorney Hawkins about the incident. (Id. at 404, 406). Hawkins did nothing with the information (Hawkins Dep. at 85), and neither he nor Erar told Trude, Knight or Jacobson that Erar had spoken to Hawkins. (Id.; Erar Dep. at 380, 404-05). There is no evidence that Trude, Knight or Jacobson were aware Erar had spoken with Hawkins on the subject.

f.    The Clocktower Commons Road Improvements

Clocktower Commons was a commercial real estate development across the street from Andover City Hall and adjacent to two Anoka County roads. Anoka County believed the roads should be improved to accommodate the development, and that the developer should bear the cost. County approval for the project was not necessary, therefore the County asked the City to require the developer to pay for the necessary improvements. Erar recommended that the City Council agree to the County's request. (Erar Dep. at 385).

The developer, Darren Lazann, objected to bearing the entire cost of improvements which he contended would also benefit other property owners.  (Erar Dep. at 386). Erar believed the minimal improvements in question were directly attributable to the development. (Id. at 387).

At a City Council workshop meeting on September 23, 2003 Jacobson, Knight and Trude voted to eliminate a required contribution from the developer for the improvements. (Pl. Ex. 48 at A01986-88). Erar felt the vote was a departure from the City's policy of requiring private development to pay for itself (Erar Dep. at 383, 386), and saw it as an incidence of "[d]oing special favors for special interests." (Id. at 392). He has testified he told the Council the vote was inconsistent with City policy and that he did not understand why a single developer was being

17

allowed to get away without paying his fair share for improvements. (<u>Id.</u> at 382-83). He specifically recalls he approached Councilmember Jacobson with his objections to the vote, (<u>id.</u> at 391-92), and that the two of them had a heated discussion on the subject. (Def. Ex. 56 at 6). Erar sees the deterioration in his relationship with Councilmember Jacobson as stemming from their differences over the Clocktower Commons improvements issue. From the September 23 meeting on Erar saw a coldness in his relationship with Jacobson that had not been there before. (Erar Dep. at 396).

    2.   <u>Law</u>

"A public employee's speech enjoys limited protection under the First Amendment." <u>Day v. Johnson</u>, 119 F.3d 650, 657 (8th Cir. 1997)(citing <u>Connick v. Myers</u>, 461 U.S. 138, 154 (1983)). The principal protection afforded by the First Amendment to public employee speech is the "right, as a citizen, to participate in discussions concerning public affairs . . . ." <u>Connick</u>, 461 U.S. at 154. Whether the First Amendment protects a public employee from discharge because of his or her speech involves a two-step legal analysis. <u>See</u> <u>Shands v. City of Kennett</u>, 993 F.2d 1337, 1341 (8th Cir. 1993). The two steps are derived from two Supreme Court cases, <u>Connick</u> and <u>Pickering v. Board of Education</u>, 391 U.S. 563 (1968). <u>Connick</u> mandates that the court first determine if the public employee speech can "be fairly characterized  as constituting speech on a matter of public concern." 461 U.S. at 146. Speech involves a matter of public concern when it addresses a "matter of political, social, or other concern to the community" at large. <u>Id.</u> at 146. Yet, content alone is not determinative of the public concern element, "content, form and context" must be considered. <u>Id.</u> at 147-48. With respect to context, the <u>Connick</u> court also held "that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum

in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." Id. at 147.

Connick did not provide much guidance on where the focus of the analysis should be; on the content of the speech, or the role of the public employee in speaking as a "citizen" or employee. The Eighth Circuit jurisprudence has not been completely congruent. Early on the court emphasized:

> The focus is on the role that the employee has assumed in advancing the particular expressions: that of a concerned public citizen, informing the public that the state institution is not properly discharging its duties, or engaged in some way in misfeasance, malfeasance or nonfeasance; or merely as an employee concerned only with internal policies or practices which are of relevance only to the employees of that institution.

Kincade v. City of Blue Springs, Mo., 64 F.3d 389, 396 (8th Cir. 1995), cert. denied, 517 U.S. 1166 (1996)(quoting Cox v. Dardanelle Pub. School Dist., 790 F.2d 668, 672 (8th Cir. 1986)). Recently, the court has again put the Connick issue as "whether the speaker was acting primarily as a concerned citizen or as an employee." Schilcher v. Univ. of Arkansas, 387 F.3d 959, 963 (8th Cir. 2004).[6]

In other cases, however, the Eighth Circuit has put the more emphasis on the content of the speech. See Sexton v. Martin, 210 F.3d 905, 910-11 (8th Cir. 2000). In still others the court has articulated the requirement the employee speak as a concerned citizen, while noting also that "purely job-related" speech is not protected, which leaves the question, what of speech that is not wholly as a concerned citizen and partly job-related? Belk v. City of Eldon, 228 F.3d 872, 879 (8th Cir. 2000), cert. denied, 532 U.S. 1008 (2001)(quoting Buazard, 172 F.3d at 548). Some cases cut both ways,

---

[6] For other Eighth Circuit cases in which the discussion tends to emphasize the role in which the public employee spoke see, e.g., Sparr v. Ward, 306 F.3d 589, 595 (8th Cir. 2002); Buazard v. Meridith, 172 F.3d 546, 548-49 (8th Cir. 1999); Day, 119 F.3d at 657.

emphasizing the role of the speaker in setting out the standard, but giving emphasis to content in the analysis. See Kincade, 64 F.3d at 396-97. Courts will soon have some authority from the U.S. Supreme Court on the subject. Garcetti v. Ceballos, S. Ct. No. 04-473, was recently argued. It presents the question:

> Should a public employee's purely job-related speech, expressed strictly pursuant to the duties of employment, be cloaked with First Amendment protection simply because it touches on a matter of public concern, or should First Amendment protection also require the speech to be engaged in "as a citizen," in accordance with this Court's holdings in Pickering v. Board of Education, 391 U.S. 563 (1968) and Connick v. Myers, 461 U.S. 138 (1983)?

125 S. Ct. 1395, 73 U.S.L.W. 3508 (2005).

It is not necessary to await the Supreme Court's decision in Garcetti because attention to the role assumed by a speaker who like Erar is at the highest level of municipal government with management, policymaking and public contact responsibilities is particularly important. Erar's day-to-day activities called for him to speak on behalf of the municipality, to advise and recommend courses of action to the elected Councilmembers on policy issues, and to address those issues of interest to the public which frequently confront municipalities. The grist of Erar's job mill was to speak on important municipal issues. To paraphrase Connick, if all such speech is protected by the First Amendment simply because of its content, virtually every remark made about City business, every policy discussed, and every criticism directed at elected officials by one in Erar's position "would plant the seed of a constitutional case" if the City's legislators did not like what they were hearing from the person they had selected to manage the City's affairs. 461 U.S. at 149. Government cannot function that way.

The Eighth Circuit has recently stressed the importance of the context in which senior appointed officials speak. In <u>Bradford v. Huckabee</u>, 394 F.3d 1012 (8th Cir. 2005), the governor of Arkansas accelerated the effective date of the resignation of his chief information officer (Bradford) when he learned Bradford intended to criticize his administration. <u>Id.</u> at 1013. On appeal from denial of a motion to dismiss, the Eighth Circuit rejected the district court's holding that Bradford had a First Amendment right to speak out on a matter of public administration. <u>Id.</u> at 1015-16. In doing so the court focused on how Bradford proposed to speak out:

> . . . Bradford resigned because of a policy dispute, not because he had been punished for exercising or attempting to exercise his public employee's First Amendment right "as a citizen, in commenting on matters of public concern." <u>Pickering v. Board of Education</u>, 391 U.S. 563, 568 (1968). As the Supreme Court reminded us in <u>Connick v. Myers</u>, 461 U.S. 138, 143 (1983):
>
>> The repeated emphasis in Pickering on the right of a public employee "as a citizen . . ." was not accidental. This language, reiterated in all of Pickering's progeny, reflects . . . the common-sense realization that government offices could not function if every employment decision became a constitutional matter.

<u>Id.</u> at 1016 (omissions by the court).

In view of the Eighth Circuit's recent emphasis on the role in which a public employee speaks and the importance of maintaining the dichotomy between speech as an employee and speech as a citizen in the case of high level government employees,  the Court believes Erar's speech on a matter of public concern was protected speech under <u>Connick</u> if Erar was primarily engaged in speaking

as a citizen, as opposed to speaking primarily as the City Administrator on policy or politically-related issues, as a representative of the City, or as an employee on matters of personal interest.[7]

If the speech addresses a matter of public concern, the court then must balance the "interests of the [employee] as a citizen, in commenting upon matters of public concern and the interest of the [municipality], as an employer in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568; see Belk, 228 F.3d at 878. The Pickering balancing of these competing interests is "highly fact-specific" and involves consideration of a number of interrelated factors. Belk, 228 F.3d at 880. These include:

> (1) the need for harmony in the office or workplace; (2) whether the government's responsibilities require a close working relationship to exist between the plaintiff and co-workers when the speech in question has caused or would cause the relationship to deteriorate; (3) the time, manner, and place of the speech; (4) the context in which the speech arose; (5) the degree of public interest in the speech; and (6) whether the speech impeded the employee's ability to perform his or her duties.

---

[7] The case law provides additional general guidelines in determining the public concern issue. Certain subjects have been recognized as by their nature involving matters of public concern, among them speech associated with the use of public funds, and speech exposing criminal activity or other potential misconduct by public officials. See Sexton, 210 F.3d at 910; Kincade, 64 F.3d at 396; Bernard v. Jackson Co., Mo., 43 F.3d 1218, 1225 (8th Cir.), cert. denied, 516 U.S. 808 (1995). It follows from what has been said before that the fact the content of an employee's speech is on a subject of public interest does not alone establish the public concern element, but neither does the fact the employee's speech occurs in the course of his or her employment necessarily preclude First Amendment protection. See Rodgers v. Banks, 344 F.3d 587, 598 (6th Cir. 2003). The employee's motivation in speaking is a consideration in determining the employee's role. Bausworth v. Hazelwood Sch. Dist., 986 F.2d 1197, 1198 (8th Cir. 1993).

That a public employee speaks privately to the employer rather than publicly is also not determinative. The First Amendment protects public and private speech. Kincade, 64 F.3d at 397 (citing Givhan v. Western Line Consol. Sch. Dist., 439 U.S. 410, 414-16 (1979)). That speech is purely internal may, however, be relevant as another contextual consideration supporting a conclusion the employee was not acting as a concerned citizen. Sparr, 306 F.3d at 595; Buazard, 172 F.3d at 549.

Id. at 880-81; Sexton, 210 F.3d at 911 (quoting Kincade, 64 F.3d at 397). "The Pickering balance is flexible, and the weight to be given any one factor depends upon the specific circumstances of each case." Shands, 993 F.2d at 1344.

The employee's position and responsibilities within the government entity may be important both in determining what factors are significant and in weighing the relative interests. "The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails." Rankin v. McPherson, 483 U.S. 378, 390 (1987). If an employee serves a "confidential, policymaking, or public contact role" the employee's speech is more likely to affect the effective functioning of the public employer than that of a rank-and-file employee. Id. at 390-91.

The defendants have the burden of producing sufficient evidence of a disruptive effect on City operations to tilt the Pickering balancing in their favor. Belk, 228 F.3d at 881 (quoting Burnham v. Ianni, 119 F.3d 668, 678, 680 (8th Cir. 1997)); Kincade, 64 F.3d at 397. Mere assertions are not enough. Kincade, 64 F.3d at 398 (quoting Grantham v. Trickey, 21 F.3d 289, 294 (8th Cir. 1994)). On the other hand, in view of the generally recognized strong interest municipalities have in the speech of those who occupy the highest positions in city government, see Curinga v. City of Clairton, 357 F.3d 305, 313 (3d Cir. 2004), if there is evidence such speech has interfered with the employee's working relationship with his superiors, Pickering comes into play. See Rose v. Stephens, 291 F.3d 917, 923 (6th Cir. 2002).

Both steps in the Pickering/Connick analysis are questions of law for the court to decide. Connick, 461 U.S. at 148 n.7; Belk, 228 F.3d at 878; Shands, 993 F.2d at 1342. If the outcome depends on the resolution of underlying disputed issues of fact, those issues should be submitted to

the jury on special interrogatories or special verdict forms. <u>Belk</u>, 228 F.3d at 878 (citing <u>Shands</u>, 993 F.2d at 1342).

If the two-step analysis works out in favor of a finding that the public employee's speech was protected, the employee must establish a causal connection to the adverse employment action and, in this case, avoid the defense of qualified immunity. In the case of the termination of employment, the former is shown by evidence that the speech "was a 'motivating factor' in the . . . decision." <u>Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 287 (1977). The present motion does not question the sufficiency of the evidence of causation except with respect to the alleged Greenhaven open meeting violation.  Qualified immunity is discussed separately below.

    3.    <u>Analysis</u>

For the reasons that follow the Court concludes there is no genuine issue of material fact about the nature and substance of Erar's speech activity, or the applicability of the <u>Pickering</u> balance of interests in the circumstances of his employment, and that defendants are entitled to summary judgment on the First Amendment claim. In each instance Erar spoke primarily as the City Administrator, or out of personal interest, not as a concerned citizen. The effect of Erar's speech on his working relationship with a majority of the members of the City Council and the importance of his position as City Administrator tilt the <u>Pickering</u> balance decisively in defendants' favor. In any event, the individual defendants have qualified immunity from suit for damages on the First Amendment claim.

    a.    Public Concern

    i.    <u>The Kellogg E-Mail</u>:  Erar's speech in connection with the Kellogg e-mail touched on three interrelated subjects: (1) Kellogg's *quid pro quo* suggestion; (2) the status

of the e-mail as "public data" under the MGDPA; and (3) whether Erar had misrepresented the City Attorney's opinion about the status of the e-mail. Kellogg's *quid pro quo* suggestion had to do with public funds and, arguably, invited malfeasance by public officials involved in the community center project. The content of Erar's advice that the City Council distance itself from Kellogg's suggestion thus concerned a subject of public interest. The same can be said of the content of Erar's speech giving his opinion that the e-mail was subject to public disclosure under the MGDPA. In both instances, however, Erar was not speaking as a concerned citizen, but as the City Administrator. His advice to the City Council to distance itself from Kellogg's suggestion was to avoid political embarrassment and the ramifications it might have for the community center. Erar said at the time his only intention was to advise the Council about the damaging nature of the e-mail and thereby "preserve the integrity of the City Council and the project"  (Def. Ex. 29). He disclaimed being a "whistleblower." As to the status of the e-mail, Erar was not communicating his opinion as a concerned citizen interested in promoting open government. Quite the opposite, that the e-mail might become public increased the risk of political harm to the City. Erar's statements to Trude and others defending himself from the accusation he had misrepresented the City Attorney's opinion was speech on a matter of purely personal interest, intended to rebut criticism of his job performance.

        ii.    <u>"Design-Build"</u>: The design-build issue was a dispute with overarching political and policy elements. Knight thought having a single major contractor design and build the community center would save money and he had an affinity for OPUS as the contractor. Erar disagreed, and raised a legal issue about the requirement for competitive bidding. He enlisted the support City Attorney Hawkins who said the same firm could design and construct a municipal project, so long as the construction was bid, the so-called "design-bid-build" approach,

which he nonetheless recommended against. Knight evidently pressed the City Council to look into the examples he touted, the Council agreed and instructed Erar to research them. That research did not support Knight and confirmed Hawkins' opinion.

Here again the subject of Erar's speech was one of public interest -- how public money would be spent to construct a municipal building. Viewed in context, however, Erar was not speaking as a citizen upon matters of public concern, he was speaking in his role as the City's chief executive charged with recommending to the City Council the means and method by which the community center would be constructed. He sought to disabuse Knight from a proposal he considered unwise and unauthorized by Minnesota law, and in the process promote a policy decision he considered best suited to construction of the community center.

   iii. <u>Knight's Conflict of Interest</u>:  Knight's advocacy for OPUS in the RFP review committee was forceful enough that other members of the committee commented to Erar about what Knight's motivation might be. Knight had said something about some kind of family connection to OPUS and Erar raised the question of a possible conflict of interest with City Attorney Hawkins. Hawkins dismissed the idea out of hand and that would have been the end of the matter had Hawkins not felt obliged to tell Knight about Erar's inquiry.

That a member of a City committee engaged in the selection process for a contractor to construct a public building might have a conflict of interest is undoubtedly a subject of public concern. It is evident Erar spoke to Hawkins primarily in his role as City Administrator to ensure that the selection process he superintended was not tainted, and perhaps in the hope of removing Knight from the process. There was no basis for Erar to approach Hawkins for a legal opinion unless he was acting in his capacity as City Administrator. Here the internal nature of the  communication

and the fact Erar said nothing further after Hawkins dismissed his concern are also against a conclusion Erar intended to speak as a concerned citizen. See note 7 supra.

iv. January 31, 2003 Memorandum: The January 31, 2003 memorandum resulted from the incident between Erar and Trude at the January 16, 2003 RFP review committee meeting. Though not on the committee, Trude was very much interested in its work as she had a right to be as an elected City Councilmember. She came to the meeting with some things on her mind, and when she said them, Erar told her remarks were improperly political. Trude became angry and expressed her feelings at the January 21, 2003 City Council meeting. Erar defended himself in the January 31, 2003 memorandum. He said he wrote the memorandum "not only to protect my reputation against [Trude's] untrue statements, but to advise the City Council of potential liability and lawsuits" which could result from Trude's actions. (Pl. Ex. 38 at JT00203).

It is apparent from the content of the memorandum as well as the context which brought it about that it was written by Erar primarily to rebut Trude's allegations about his conduct and defend his reputation, as well as, by turning the tables on Trude, to isolate her from the other Councilmembers and the RFP review process. As such it was written for personal reasons. The memorandum cannot reasonably be viewed as speech by a concerned citizen. It did address "Data Privacy Concerns" arising from Trude's participation in the RFP review process, and raised the spectre of litigation as a result of Trude's conduct. These were subjects of public interest, but viewed in the context of the entire memorandum it seems apparent Erar's inclusion of them was intended to reinforce the central message of the memorandum that he was blameless and Trude should not be involved in the RFP review process.

v.     Greenhaven Open Meeting Law Violation: Erar's report to City Attorney Hawkins that he had seen Trude, Knight and Jacobson talking about what Jacobson later told him was the City's pending purchase of land from the Slyzuks, involving as it did potential misconduct by elected officials, was speech on a matter of public concern, but neither Erar nor Hawkins made Trude, Knight or Jacobson aware of the speech. It could not, therefore, have been a motivating factor in the Councilmembers' decision to terminate Erar's employment. Consequently there is no need to consider the incident further with respect to the First Amendment claim.

Erar contends the speech in question also includes what passed between Erar and Jacobson when Jacobson "admitted" they had been discussing the Slyzuk land deal. It is not clear, however, that Erar gained this information through any speech on his part. When asked in his deposition about the conversation Erar testified Jacobson came into his office and said that he had misunderstood something City Attorney Hawkins had said about the land deal and, without being interrogated by Erar, "admitted" that was what the three Councilmembers had been talking about in the parking lot. (Erar Dep. at 381; see id. at 378).[8]

Even if Erar had asked "what were you talking about," the Court does not believe a casual inquiry of this kind in the setting described by Erar could be considered speech on a matter of public concern because the subject of the concern is not evident from the inquiry.

vi.     The Clocktower Commons Improvements: The Clocktower Commons episode was also essentially a policy dispute. Trude, Knight and Jacobson apparently agreed with the developer that he should not have to bear the entire cost of the road improvements and voted to

---

[8] Jacobson denied the conversation occurred. (Jacobson Dep. at 100-01). Erar does not contend he discussed the subject of a possible Open Meetings Law violation with Jacobson.

eliminate the requirement. Erar thought the vote was inconsistent with the City's policy of having development pay for itself, represented a sweetheart deal for the developer and in substance said so. It is evident Erar was not pleased that the three Councilmembers had rejected his recommendation in the matter. Though the subject matter had to do with the expenditure of public funds, Erar was speaking as City Administrator in support of a recommendation his office had made, and against what he saw as an exception to a longstanding City policy. He was not primarily engaged in speech as a citizen on a matter of public concern.

    b.  <u>Pickering</u>

   Assuming the speech in question addressed matters of public concern, when the <u>Pickering</u> balancing test is applied the City's interest in the effective functioning of City Government outweighed Erar's interest in commenting on matters of public concern. The starting point is the unique position in City Government held by Erar as the City Administrator. He was in charge of the operations of City Government, he was a policymaker,  and he was the public face of the City. The City ordinance establishing his position, Ordinance No. 216, summarized the City Administrator's duties as follows:

> Directs and manages all City operations as delegated by the City Council within the parameters of state statute and City policy to ensure the effective and efficient operation of all City departments through a subordinate department head structure. Serves as primary liaison with the City Council to inform them of relevant projects and issues. Recommends policy changes and communicates council decisions to appropriate City staff. Guides the development and implementation of departmental management, human resource and labor relations policies and practices. Serves as the City's key representative in cooperative efforts with other governmental or

private entities. Responds to citizen questions and complaints either directly or through appropriate personnel.

Reports to and serves at the discretion of the elected mayor and council. Exercises supervisory authority over all City employees, through a department structure. Oversees all hiring, promotion, and termination recommendations as well as rewards, discipline, grievances, training, performance appraisal and other employment conditions.

(Pl. Ex. 2 at A00457).

Among the City Administrator's specific duties were:

Supervise directly or indirectly all personnel of the City . . . .

. . . Develop and issue administrative rules, policies and procedures necessary to ensure the proper function of all departments.

. . .

Inform the City Council on matters dealing with the administration of the City . . . .

. . . Recommend to the City Council such measures as deemed necessary for the welfare of the citizens and the efficient administration of the City. . . .

Represent the City at functions as directed by the Council. Maintain good public relations with the citizens of the community.

. . . .

Coordinate municipal programs and activities as directed by Council. Monitor all consultant and contract work performed for the City. Coordinate the activities of the City attorney.

(Pl. Ex. 2 at A00457-58).

Erar minimizes his role in policymaking, pointing out that while he had internal policymaking responsibilities, his role in the broader context was to implement policies set by the City Council. It has been held that a policymaking employee "is one whose position 'authorizes,

30

either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation.'" Vargas-Harrison v. Racine Unified Sch. Dist., 272 F.3d 964, 972 (7th Cir. 2001)(quoting Nekolny v. Painter, 653 F.2d 1164, 1170 (7th Cir. 1981)). By this standard, with which the Court agrees, Erar was clearly a policymaker as his job description expressly included recommending policy changes to the City Council. Moreover, the record summarized previously demonstrates that Erar in fact played a central role in shaping City policy.

Because the City Council depended on Erar to manage the City's business, and to recommend and implement City policies, having the trust and confidence of the Council was essential to the effective, efficient performance of Erar's duties, as he recognized. (Erar Dep. at 93-94). The government interest weighs particularly heavy in the Pickering balance in the case of high level employees who serve a confidential, policymaking, or public contact role in the operations of government. See Rankin, 483 U.S. at 390-91; Curinga, 357 F.3d at 313 (municipal manager); Rose, 291 F.3d at 921 (commissioner of state police); Kinsey v. Salado Ind. Schl. Dist., 950 F.2d 988, 994 (5th Cir. 1992)(en banc)(school superintendent); Fender v. City of Oregon City, 811 F. Supp. 554, 561 (D. Or. 1993), aff'd, 37 F.3d 1505 (9th Cir. 1994)(Table Case)(city manager). As a result of Erar's position in City government, the focus of the Pickering balancing of interests in this case is not so much on the effect of Erar's speech on the "workplace" -- City Hall -- as Erar argues, but on the effect the speech had on the working relationship between Erar and the elected officials who appointed him.

As noted previously, the Eighth Circuit has identified a number of relevant factors to consider as they may pertain in the circumstances. The first of these, the need for harmony in the office or workplace, is not a significant consideration because this case is not about a disruptive working environment. The second factor, the importance of a close working relationship between plaintiff and co-workers, needs to be adjusted to the circumstances. The  relevant working relationship was  that between the City Council and the City Administrator, and there is no question a close working relationship was important to the function of City government. See Curinga, 357 F.3d at 313 (City manager position was "one that required confidentiality and a close working relationship with city council members to effectively implement their policies."). The speech in question was both a cause and a reflection of the deterioration in the relationship between Erar and a majority of the City Council. See Belk, 228 F.3d at 880.

Erar argues the Court should only look objectively at whether the business of the City was being accomplished; disruption in the working relationship between Erar and the City Councilmembers resulting from his speech should not be the relevant concern. Otherwise the Councilmembers' alleged retaliation against him for engaging in protected conduct becomes the disruption which avoids liability. (Hrg. Tr. at 41-42). The Court disagrees. Where, as here, a close working relationship between the most senior appointed City official and his elected superiors is important to the discharge of government responsibilities, speech which causes that relationship to deteriorate is necessarily an important factor in the Pickering balance.

As to the time, manner and place of the speech in question, the disputes concerning the "design-build" issue, Erar's interaction with Trude concerning the RFP review committee meeting which precipitated the January 31, 2003 memorandum, and the Clocktower Commons road

improvements matter were aired at least in part in public, which may have contributed to the deterioration in the relationship between Erar and the Councilmember defendants, but the manner of the speech here is more relevant than the time and place where it occurred. On that score, much of the speech in question was a reaction by Erar to criticisms of his conduct or performance. Erar tended to view these as an attack on his integrity and responded by challenging the accuracy, motives and integrity of those Councilmembers with whom he disagreed.

Erar's response to Trude's allegation he had misrepresented City Attorney Hawkins' opinion about the Kellogg e-mail included expressions of resentment for what Trude had said, disbelief that she was attacking his character, and criticism of Trude for appearing not to worry about the e-mail if it was not public. When in April 2003 Trude and Knight gave him a bad performance evaluation, in part over his handling of the e-mail incident, Erar circulated a memorandum to the Mayor and Councilmembers in which he characterized their criticisms as "retaliatory and designed to advance personal biases toward this office." (Def. Ex. 40 at A00280). Erar's memorandum response to Trude's complaint about rude treatment at the RFP review committee meeting was to attack Trude as having made a veiled threat to the committee, accuse her of attempting to retaliate against him by damaging his reputation, complain that she had attempted to discredit him in the eyes of City staff, and charge her with improperly using her position to disclose confidential information in the RFP's in a way which exposed the City to litigation. Trude's perhaps predictable reply was to condemn Erar for what she characterized as a personal and slanderous attack. Erar's reaction to the vote to eliminate the developer's Clocktower Commons road improvement contribution was to tell the Councilmembers they were acting contrary to City policy and to suggest the vote was a product of favoritism shown to the developer. This led to a heated discussion with Jacobson and a worsening

of their working relationship. Erar may have had good reason for the manner in which he criticized the Councilmember defendants, but it had a destructive effect on his working relationship with them.

The next factor is context. The speech in question involved two types of disputes between Erar and the defendant Councilmembers:  personal disputes (chiefly with Trude and Knight) and policy/political disputes with one or more of the Councilmembers (design-build, Clocktower Commons, and to some extent, the Kellogg e-mail). Erar's personal disputes with members of the City Council do not weigh very heavily on the scale in his favor. Shands, 993 F.3d at 1346. Nor in view of Erar's role in making and implementing City policy does the fact Erar had policy differences with a majority of the City Councilmembers weigh in his favor. See Bradford, 394 F.3d at 1016; Rose, 291 F.3d at 922; Fender, 811 F. Supp. at 561.

The degree of public interest in Erar's speech is a neutral factor. The controversy over the Kellogg e-mail did not go beyond the City administration. The design-build issue was addressed in public meetings, but does not seem to have gained much interest outside those involved in the process. Knight's potential conflict of interest did not see the light of day and is relevant principally as a source of Knight's antipathy toward Erar. Erar's January 31, 2003 memorandum was an internal communication and did not generate public interest. The dispute about the Clocktower Commons improvements was publicly debated, but there is no evidence it generated a significant degree of public interest.

Lastly, if, as Erar alleges, his speech was a cause of his discharge, it is evident the speech affected his ability to perform his duties as City Administrator. He lost the trust and confidence of a majority of  the City Council without which he could not effectively serve as City Administrator. A year before the termination of his employment Erar realized he was in trouble. The harsh

comments of Trude and Knight  in their April 2003 evaluations of his performance signaled their lack of confidence. Jacobson gave a more balanced evaluation at the time, but noted Erar's poor relationship with several members of the Council and warned: "A house divided cannot survive." (Pl. Ex. 13 at 1). Erar suggested a mediator be hired to foster a stronger working relationship between himself and the City Council and spoke of his working relationship with the City Council as a two-way street. (Id. at A00280-81). That did not happen. His relationship with Trude and Knight continued to deteriorate. Erar would later write in a timeline of events that by September 2003 his "[w]orking relationship with CM Knight and Trude [was] essentially non-existent," and his relationship with Jacobson was worsening. (Def. Ex. 56 at 5).

In support of his tortious interference claim, Erar alleges Trude, Knight and Jacobson pursued a personal vendetta against him. In addition to the incidents which underlie his First Amendment Free Speech claim, he has cited several examples of what he believes the Councilmember defendants did to undermine his authority. Though the parties differ on some of the underlying facts and their significance, Erar's argument about them serves to illustrate the level of distrust that developed between Erar and his two main Councilmember protagonists, Trude and Knight.[9]

---

[9] In early 2003 the City Council authorized Erar to negotiate a purchase of farmland adjacent to City Hall with the property owners, the Slyzuks. Erar obtained an appraisal of $49,350 per acre. (Def. Ex. 42 at A00410). In May Erar informed the City Council he had negotiated terms of  a purchase for $50,000 per acre. (Id. at A00410-11). However, in the ensuing months the proposal evolved into one in which the City would pay the Slyzuks $55,000 per acre with the Slyzuks offering to make a contribution to the community center capital campaign totaling about $173,000. (Def. Ex. 47). Erar saw this as a way to jumpstart the capital campaign which had languished, a "win-win" situation. (Erar Dep. at 341, 343-44). Erar had cleared the arrangement with the City Attorney. (Erar Dep. at 354; Def. Ex. 47). Though he was concerned about how the gift-back aspect would be perceived, City Attorney Hawkins told Erar that as long as the transaction was for fair
(continued...)

Consideration of the relevant <u>Pickering</u> balance factors, to the extent they bear on this case, leads to the conclusion the speech upon which Erar relies for his First Amendment retaliation claim had a disruptive effect on the City's operations in that it was a cause of deterioration of the critical working relationship between Erar and a majority of the elected Councilmembers. Assuming Erar spoke as a concerned public citizen on matters of public concern, his interest in speaking as a citizen was, in view of Erar's employment as the City Administrator, outweighed by the interests of the City of Andover in promoting the efficiency of its government operations.[10]

---

[9](...continued)

market value and was fully disclosed there was no legal impediment. (Hawkins Dep. at 94-95; Def. Ex. 46). At a City Council workshop meeting on September 23, 2003 Trude accused Erar of acting unethically in the matter. (Erar Dep. at 350-51; <u>see</u> Pl. Ex. 45). The upshot of the dispute was that Erar withdrew from activities associated with the capital campaign and the land purchase went forward for the originally proposed $50,000 per acre. (Def. Ex. 47, 48).

In November 2003 Knight requested that City Finance Director Dickinson provide him with information concerning Erar's use of leave and compensatory time, expressing concern about the amount of time Erar had been taking off. (Dickinson Dep. at 91). In March 2004 Knight and Trude separately requested the same information for the previous two years. (<u>Id.</u> at 98). Erar viewed questions about his time off as a form of harassment.

Erar contends that at a January 2004 workshop Jacobson, Knight and Trude accused him of acting outside the City Council approval in the course of negotiating a lease agreement with the YMCA, (Pl. Ex. 26; Ans. to Int. No. 3), when in fact, he had not exceeded his authority. (Pl. Ex. 46). Erar complained about the matter having been raised publicly rather than privately. (<u>Id.</u>)

Finally, in March 2004 a question arose concerning to whom the municipal ice arena manager should report. Erar thought City ordinances required that the manager report to him. (Erar Dep. at 400-01). Jacobson, Knight and Trude favored having the arena manager report directly to the City Council. (<u>Id.</u>) At a City Council workshop Knight said he would never allow the rink manager to report to Erar (Erar Dep. at 399-400), and made similar statements about the management of the community center. (<u>Id.</u>)

[10] Though the Court has applied the usual <u>Pickering</u> factors in reaching this conclusion, the Court notes there is a substantial body of case law from other circuits holding that the <u>Pickering</u> analysis can be by-passed in the case of an employee in a policymaking or a confidential position terminated for speech related to his political or policy views because in such cases the balance of such interests "favors the government as a matter of law." <u>Rose</u>, 291 F.3d at 922; <u>see</u> <u>Kiddy-Brown v. Blagojevich</u>, 408 F.3d 346, 358 (7th Cir. 2005)("in cases involving the dismissal of an employee
(continued...)

c.     Qualified Immunity[11]

If Erar has sufficiently alleged a violation of his First Amendment constitutional rights, and

produced evidence sufficient to conclude he spoke as a citizen on matters of public concern with

respect to which his interests prevail in the Pickering balance, the Court does not believe it would

have been clear to a reasonable person in the position of the defendant Councilmembers that the

calculus worked out in Erar's favor. See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "Qualified

immunity protects public officials unless their conduct violates clearly established statutory or

constitutional rights of which a reasonable person would have known." Abdouch v. Burger, _ F.3d

_, 2005 WL 2665337 at *4 (8th Cir. Oct. 20, 2005). There are two steps in the qualified immunity

inquiry.

> First, we ask whether the facts as asserted by the plaintiff "show the
> [official's] conduct violated a constitutional right." Saucier v. Katz,
> 533 U.S. 194, 201 (2001). If the answer is no, we grant qualified
> immunity. If the answer is yes, we go on to determine "whether the
> right was clearly established." Id. "The relevant, dispositive inquiry
> in determining whether a right is clearly established is whether it
> would be clear to a reasonable [official] that his conduct was
> unlawful in the situation he confronted." Id. at 202.

Wright v. Rolette County, 417 F.3d 879, 884 (8th Cir. 2005). The second step is a "fact-intensive

inquiry" which "must be undertaken in light of the specific context of the case, not as a broad

---

[10](...continued)
in a policymaking position, 'there is no need for a fact-specific analysis of the circumstances in each
case,'" quoting Vargas-Harrison, 272 F.3d at 971).

[11] Defendants raise qualified immunity as a fall-back defense if their arguments on the merits
of the First Amendment claim are rejected, not as a threshold issue of whether Erar has adequately
alleged a deprivation of his First Amendment rights. See County of Sacramento v. Lewis, 523 U.S.
833, 841 n.5 (1998). Erar's Second Amended Complaint pleads the factual basis for his claims in
some detail and from the foregoing discussion it should be evident the Court doubts it is sufficient
to adequately allege a First Amendment violation.

proposition." Littrell v. Franklin, 388 F.3d 578, 583 (8th Cir. 2004)(quoting in part Saucier, 533 U.S. at 201; see Janis v. Biesheuvel, __ F.3d __, 2005 WL 2739139, *2 (8th Cir. Oct. 25, 2005). "[O]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." Littrell, 388 F.3d at 582 (quoting Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992)).

It is well-established government "may not condition public employment on an employee's exercise of his or her First Amendment rights." Bradford, 394 F.3d at 1015 (quoting O'Hare Truck Serv., Inc. v. City of Northlake, 518 U.S. 712, 717 (1996)); see Rankin, 483 U.S. at 382. The two-step Connick/Pickering analysis has also in general terms been the well-established means to determine a First Amendment violation in this context. See Powell v. Johnson, 405 F.3d 652, 655 (8th Cir. 2001); Herts v. Smith, 345 F.3d 581, 585-86 (8th Cir. 2003). It is in applying the analysis to the speech in question that a gray area emerges to create unclarity. This is a case in which it would be "difficult for a [public official] to determine how the relevant legal doctrine . . . [would] apply to the factual situation" at hand. Saucier, 533 U.S. at 205.

First, there is the question of where Erar's speech fits in the Connick dichotomy. The case law in this circuit does not clearly pigeonhole it as speech by a concerned citizen. That the Supreme Court has granted certiorari to review the importance of distinguishing the speaker's role as "a citizen" from that of an employee supports a determination that where Erar's speech fit would not have been evident, particularly in the case of an employee at his level. A substantial part of the speech alleged was "mixed" speech in which there were arguably elements of public concern, but also speech on personal matters having to do with Erar's disintegrating relationship with Councilmembers, principally Trude and Knight. The latter is beyond the pale of First Amendment protection. See Schroeder v. City of Vassar, 371 F. Supp. 2d 882, 897 (E.D. Mich. 2005)(citing

Farhat v. Jopke, 370 F.3d 580, 590 (6th Cir. 2004) for the proposition "mixed speech" cases are difficult to determine).

Beyond public concern, the Pickering balance of interests here is also affected greatly by Erar's status as the City Administrator. To begin with, "when Pickering's fact-intensive balancing test is at issue, the asserted First Amendment right can rarely be considered clearly established for purposes of the Harlow qualified immunity standard." Sexton, 210 F.3d at 914 (quoting Grantham, 21 F.3d  at 293); see Bartlett v. Fisher, 972 F.2d 911, 916 (8th Cir. 1992). As the government interest in speech by high level, policymaking officials is much stronger than in the case of lower level employees, Rankin, 483 U.S. at 390; Curinga, 357 F.3d at 313, a favorable outcome for Erar would objectively be even less apparent. In fact, had defendants done some legal research at the time they would have discovered that some courts of appeal, borrowing from the Elrod/Branti political affiliation cases,[12] had held "where an employee is in a policymaking or confidential position and is terminated for speech related to his political or policy views, the Pickering balance favors the government as a matter of law." Rose, 291 F.3d at 921-22 (citing cases). Indeed, the Ninth Circuit had extended the principle to all speech by employees at the policymaking level. See Biggs v. Best, Best & Krieger, 189 F.3d 989, 994-95 (9th Cir. 1999). The case law in our circuit is less clear, but that fact alone supports a finding of qualified immunity.

For the reasons indicated, if Erar was forced to resign because Trude, Knight and Jacobson disliked or disagreed with his speech on the matters alleged, a reasonable person in their position would not have known they acted in a manner which deprived Erar of his First Amendment Free

---

[12] Branti v. Finkel, 445 U.S. 507 (1980); Elrod v. Burns, 427 U.S. 347, 367 (1976).

Speech rights. See Sparr, 306 F.3d at 593. The individual defendants are thus immune from suit for

damages.[13]

**B.      Due Process Liberty Interest**

Erar argues that Trude made public stigmatizing accusations which impugned his

professional integrity and he was denied an opportunity to clear his name as required by procedural

Due Process.  Generally, an at-will public employee does not have a protected liberty interest in

continued employment requiring a hearing be afforded in connection with a discharge. Speer v. City

Wynne, 276 F.3d 980, 984 (8th Cir. 2002). There is an exception to the general rule if the discharge

is accompanied by stigmatizing statements or allegations by the employer about the employee "that

are so damaging as to make it difficult or impossible for the employee to escape the stigma"

resulting from the statements. Howard v. Columbia Public Sch. Dist., 363 F.3d 797, 802 (8th Cir.),

cert. denied, _ U.S. _, 125 S. Ct. 436 (2004)(quoting Winegar v. Des Moines Indep. Commun. Sch.

Dist., 20 F.3d 895, 899 (8th Cir. 1994)). In that event the employee's liberty interest is implicated

and procedural Due Process entitles him to the opportunity for a "name clearing" hearing. Speer, 276

F.3d at 984; see Board of Regents v. Roth, 408 U.S. 564, 573 (1972).

To avoid summary judgment on his liberty interest procedural Due Process claim Erar must

produce evidence that (1)  he was stigmatized by allegations made by Trude in connection with his

discharge; (2) the allegations were made public; and (3) he denied the allegations. Putnam v. Keller,

---

[13] The decision to terminate Erar's employment was made by Andover's legislative body -- the City Council -- and accordingly constituted "an act of official government policy," exposing the City to liability under § 1983 on Erar's First Amendment claim. Pembaur v. Cincinnati, 475 U.S. 469, 480 (1986). However, "in order for municipal liability to attach, individual liability first must be found on the underlying substantive claim." McCoy v. City of Monticello, 411 F.3d 920, 922 (8th Cir. 2005); Turpin v. County of Rock, 262 F.3d 779, 784 (8th Cir. 2001).

332 F.3d 541, 546 (8th Cir. 2003); Speer, 276 F.3d at 984; see Howard, 363 F.3d at 802. The stigma must be significant enough to "seriously damage [the former employee's] standing and associations in the community, or foreclose [the employee's] freedom to take advantage of other employment opportunities." Shands, 993 F.2d at 1347. Typically, statements found to carry the requisite level of stigma involve allegations of "dishonesty, immorality, criminality, racism and similar character-demeaning charges." Howard, 363 F.3d at 802. No liberty interest arises when "the employer has alleged merely improper or inadequate performance, incompetence, neglect of duty, or malfeasance." Mercer v. City of Cedar Rapids, 308 F.3d 840, 845 (8th Cir. 2002)(quoting Buchholz v. Aldaya, 210 F.3d 862, 866 (8th Cir. 2000)); see Waddell v. Forney, 108 F.3d 889, 895-96 (8th Cir. 1997). The stigmatizing allegations must be made in the course of or in connection with the employee's discharge. Paul v. Allen, 424 U.S. 693, 705, 710 (1976); Waddell, 108 F.3d at 896 (citing Siegert v. Gilley, 500 U.S. 226, 234 (1991)). Allegations are made publicly if made "in any official or intentional manner." Putnam, 332 F.3d at 547 (quoting Speer, 276 F.3d at 985).

The City Council did not make any formal or official statements concerning the reasons for the termination of Erar's employment. He was allowed to resign at his request in order to avoid the stigma of being fired. (Erar Dep. at 239). The separation agreement did not say anything about the reasons. (Def. Ex. 54) . The April 20, 2004 City Council meeting at which Jacobson made his motion to terminate Erar's employment (see April 22, 2005 R&R at 11-12), the ensuing discussion and vote to negotiate a separation agreement, and the meeting at which the separation agreement was approved were closed sessions. (Def. Ex. 51, 52). The defendant City Councilmembers did not say anything publicly about their reasons. (See Def. Ex. 53). Instead, Erar bases his liberty interest Due

Process claim on statements made by Trude preceding the termination and shortly afterward to a City resident, a City employee, and a woman employed by a cable television company.

On April 12, 2004, Erar learned of an e-mail Trude had sent to the President of the Andover Athletic Association, Tom Berard, discussing disagreements she had with Erar concerning the location of some softball fields.

> . . . We have disagreements with the administrator's way of thinking on a number of critical issues going back to the location. He [Erar] saw this as a "cheap site" b/c of the sewer/water access. He is not one who understands the shortage of play fields in this city -- never having been a sideline dad b/c he was a workaholic. Now he's biding time looking for a better job where he can run the council and staff w/o accountability to constituent interests -- he's taken over 10 weeks off (full weeks) in the past year and missed meetings involving the council and Y.

(Pl. Ex. 51 at JT00303). While Erar states in his brief that Trude's statements to Berard were made "shortly before the Defendants moved to terminate him," (Pl. Mem. at 42),  in fact, as shown below, the e-mail to Berard was sent by Trude months before the termination.

On April 5, 2004 Trude told City staff member Pat Janssen Erar was going to be terminated and that he was not addressing important City business because of his impending termination. (Pl. Ex. 50; Erar Dep. at 255-56; Trude Dep. at 300-01). Finally, after the termination of Erar's employment Trude allegedly told an Anoka cable television employee named "Becky" who hosted a City Council "update" program that Erar had been fired for proposing a donation to the community center from a resident with whom the City was negotiating a land purchase, evidently referring to the Slyzuk negotiations. (Orttel Dep. at 12-13; see note 9, supra).[14]

---

[14] In their memoranda the parties cite to the Orttel deposition at pages 12 and 13. The Court cannot locate these pages in the motion papers provided in connection with the present motion for
(continued...)

Though Erar was made aware of the Trude e-mail to Berard shortly before he was forced to resign, it is uncontradicted Trude sent the e-mail to Berard on January 8, 2004 as shown by the date on the e-mail header. (Def. Reply Mem. Attach. Ex. A to Aff. of Harris at JT00457). Neither temporally nor in content were the alleged stigmatizing statements made in the course of or in connection with the termination of Erar's employment. Additionally, Trude's criticism of Erar's handling of issues relating to softball fields, and her comments about his being a workaholic, her belief he was biding his time looking for a better job, and the large amount of leave he had taken are not character-demeaning statements akin to allegations of dishonesty, immorality, criminality, or racism which could reasonably be viewed as sufficiently damaging to Erar's standing in the community and future employment opportunities so as to implicate a liberty interest.[15] Mercer, 308 F.3d at 845.

Trude's statement to Janssen that Erar was going to be terminated accompanied by the general criticism that he had not been attending adequately to City business is the kind of general allegation of inadequate performance or neglect which clearly does not involve a liberty interest.

In his deposition Councilmember Orttel said Becky told him Trude had told her Erar was terminated for proposing a donation from a resident with whom the City Council was negotiating a land purchase. Orttel's testimony about Becky's statement is hearsay if offered to prove what Trude said to Becky. Defendants have produced an affidavit from the cable television update host in

---

[14](...continued)
summary judgment; however, the pages in question can be found in the motion papers submitted in connection with defendants' earlier motion for partial summary judgment.

[15] In fact, Berard did not approve of or agree with Trude's criticisms of Erar. He thought highly of Erar's efforts on behalf of the children who used Andover's baseball and softball fields and his comments along these lines were communicated to the City Council. (Def. Ex. 51 at A00320).

question, Rebecca Steffens, who says that shortly after Erar left employment, she (Steffens) initiated a conversation with Trude in which Trude "related to me the basic facts" concerning the Slyzuk land purchase negotiation and said she had not approved of Erar's conduct. Steffens believed Erar had voluntarily resigned and Trude said nothing to make her think otherwise. (Def. Reply Mem. Attach. Aff. of Steffens). She also states she told the same thing to Erar's attorney when he contacted her, and in response to a question from the attorney asking if Trude told her the City had terminated Erar because of the Slyzuk negotiation, answered "no." (Id.) There appears to be no dispute that Steffens was the person to whom Orttel was referring in his deposition. Erar has not identified admissible evidence that Trude made the alleged stigmatizing statement to Steffens, and what Steffens says Trude told her about her objections to Erar's conduct in connection with the Slyzuk negotiations as a matter of law amounts to no more than criticism of his performance. Nor were Trude's comments, as described by Steffens, made in the course of or in connection with Erar's termination. Even if Trude had made a statement like that relayed by Orttel, it implied unsatisfactory job performance and arguably malfeasance, see Mercer, 308 F.3d at 845, but not anything like dishonesty, immorality, or criminality.

The Court thus concludes the evidence is legally insufficient to support a finding that Trude made stigmatizing allegations in connection with Erar's termination which gave rise to a liberty interest. Summary judgment should be granted on the Due Process claim in this regard.[16]

---

[16] Defendants also argue Erar was not stigmatized because he was hired in a comparable position as Administrative Manager of this district's U.S. Probation Office about seven weeks after his separation from the City. See Stretten v. Wadsworth Veterans Hosp., 537 F.2d 361, 366 & n.14 (9th Cir. 1976); Vukelic v. Bartz, 245 F. Supp. 2d 1068, 1083-84 (D.N.D. 2003). Erar disputes that his present employment is comparable, and contends the loss of employment with the City of Andover interfered with his career progression plans. He also states he was taken off the "short list" (continued...)

C.      **Conclusion**

The Court has concluded the evidence put forward by Erar, viewed favorably to him, is insufficient to make a submissible case that the termination of his employment violated his federal constitutional Free Speech and Due Process rights. That does not mean Erar's forced resignation was right, wise or fair. There are many indications it was none of these. Mayor Gamache and Councilmember Orttel completely disassociated themselves from the decision. (Def. Ex. 52). To say they disagreed with the decision to force Erar out is a considerable understatement. Mayor Gamache was moved to write an open letter to the "People of Andover," which was published in the Anoka County Union newspaper. In it he extolled Erar's performance and condemned the action of his City Council colleagues. (Def. Ex. 54). In an April 30, 2004 e-mail to City employees Mayor Gamache wrote that a "grave injustice" had been done to Erar. (Pl. Ex. 20). He thanked Erar for all he had done for the City and ticked off an impressive list of accomplishments, including the community center, building a water treatment plant, balancing the budget in a time of financial crisis, promoting development, and construction of a new fire station. (Id.) There is ample evidence in the record that Erar was "a hardworking and dedicated employee throughout his tenure as City Administrator." (Pl. Mem. at 9).

That said, the fact is Erar's disagreements with Trude, Knight and Jacobson cost him the support of a majority of the City Council. Those disagreements and Erar's criticisms of the defendant Councilmembers did not cloak Erar in constitutional immunity from discharge. Nor, in the Court's

---

[16](...continued)
for a similar position with another City when he disclosed his impending departure from employment with the City of Andover. The Court does not believe the fact Erar relatively quickly obtained his present employment is alone dispositive of his Due Process liberty interest deprivation claim.

judgment, are Erar's past accomplishments evidence that he could have soldiered on for Andover and effectively functioned as City Administrator notwithstanding the breakdown in his working relationships with the majority of the City Council. In the final analysis, the City Council is "entitled to the services of a city [administrator] who dances to the same music as the [city council]." Fender, 811 F. Supp. at 561.

## II.

### CONTINUED EXERCISE OF SUPPLEMENTAL JURISDICTION OVER STATE LAW CLAIMS

If this Report and Recommendation and the previous April 22, 2005 R&R result in the dismissal of Erar's federal constitutional claims, the question arises whether the Court should continue to exercise supplemental jurisdiction over the state law claims. A federal district court "may decline to exercise supplemental jurisdiction over a claim" if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). In deciding whether to continue to exercise supplemental jurisdiction a court must consider and weigh "the values of judicial economy, convenience, fairness and comity" articulated by the Supreme Court in United Mineworkers of America v. Gibbs, 383 U.S. 715, 726-27 (1966). Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988). Where all the federal claims have been dismissed these factors will usually "point toward declining to exercise jurisdiction over the remaining state law claims." Id. at 350 n.7; see Gibbs, 383 U.S. at 726. If the court decides not to exercise supplemental jurisdiction in a removed case it has discretion to remand the pendent state claims. Ali v. Ramsdell, 423 F.3d 810, 811 (8th Cir. 2005)(citing Cohill, 484 U.S. at 350-51).

The state law claims on which the April 22, 2005 R&R recommended granting the first motion for summary judgment, the MGDPA claim (Count IV) and the breach of contract claim (Count VI) are both straightforward and clearly lacking in merit. No objection has been made to the recommendation that these claims be dismissed and there is no reason to decline to exercise supplemental jurisdiction to do so.

The other state law claims stand on a different footing. The Open Meeting Law and Whistleblower statutory claims involve laws enacted by the Minnesota legislature to protect the interest of the public in open government and employees who report wrongdoing to employers or public officials. It is preferable that claimed violations of state laws of this character by local public officials be determined in state courts which are both "surer-footed" in applying applicable state law and the more appropriate forum in which to hold such officials accountable. Gibbs, 383 U.S. at 726. These are considerations of comity and fairness.

In the April 22, 2005 R&R I recommended that the motion for summary judgment to dismiss the tortious interference claim (Count I) on legal grounds be denied. The reason had to do with a narrow issue of Minnesota law: whether the actual malice element necessary to prove the tortious interference claim against the defendant Councilmembers took the case outside of the "general rule that certiorari is the exclusive remedy for wrongful termination claims brought by employees of an executive body that has less than statewide jurisdiction." Tischer v. Housing and Redevelopment Authority of Cambridge, 693 N.W.2d 426, 428 (Minn. 2005). I concluded that it did based principally on the unreported decision of this Court in Lueth v. City of Glencoe, 2002 WL 31059892 (D. Minn. 2002). Plaintiff's success on his tortious interference claim hinges in the first instance on a favorable determination of what can appropriately be regarded as a complex issue of state law, an

47

additional circumstance in which the Court may decline to exercise supplemental jurisdiction. 28 U.S.C. § 1367(c)(1).[17] Beyond the difficult issue of Minnesota law involved, here also considerations of comity and fairness make state court the more appropriate forum in which to resolve a claim that local elected officials maliciously terminated the employment of a City employee.

At argument counsel for the parties indicated they preferred that this Court adjudicate the claims addressed by the motions for summary judgment.[18] The factors of judicial economy and convenience provide some support for the retention of supplemental jurisdiction. Discovery is completed and dispositive motions have been fully submitted. Remand of the state claims to state court would involve a measure of delay and additional expense, but in view of the state of the litigation and the fact trial in this Court is still some months away, the delay need not be long nor the additional expense significant. In the Court's judgment the considerations of comity and fairness which favor the state court forum as the place to adjudicate the remaining state law claims predominate. The Court should decline to exercise supplemental jurisdiction of the claims in Counts I, II, and V and remand the same to the state court from which they were removed.

---

[17] It would not have been appropriate in the April 22, 2005 R&R to recommend declination of supplemental jurisdiction on this ground because at the time that would have portended bifurcation of the case between state and federal courts, an undesirable result.

Defendants also argue the state law defense of official immunity with respect to the tortious interference claim. (Def. Mem. at 69).

[18] Defendants have moved for summary judgment on all claims except the alleged Open Meeting Law violation when the defendant Councilmembers discussed the Slyzuk land purchase in the country club parking lot. (Supra at 16-17). Defendants have no objection to the remand of this claim if all of the other claims are dismissed.

## III.

## RECOMMENDATION AND ORDER

For the reasons discussed above, I respectfully recommend that defendants' July 18, 2005 motion for summary judgment be **granted in part**. Taking this recommendation together with that on defendants' previous motion for partial summary judgment, the undersigned recommends that Counts III, IV and VI of the Second Amended Complaint be dismissed. I further recommend that the Court decline to exercise supplemental jurisdiction over the state law claims in Counts I, II, and V of the Second Amended Complaint as permitted by  28 U.S.C. § 1367(c)(1), (3), that the Court not act further on the April 22, 2005 R&R concerning Count I, and that said claims be remanded to the Minnesota District Court, Tenth Judicial District, County of Anoka.

The Court will extend the time for objections provided in LR 72.1(c)(2). IT IS ORDERED that the parties have to and including **November 21, 2005**, to file written objections to this Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1). Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990). Any objections filed must identify the specific portions of the Report and Recommendation and set forth the basis for such objections. See Fed. R. Civ. P. 72; Thompson, 897 F.2d at 357. Failure to timely file objections may constitute a waiver of a party's right to appeal questions of fact. Thomas v. Arn, 474 U.S. 140, 155 (1985); Thompson, 897 F.2d at 357.

IT IS SO ORDERED.

Dated this 1st day of November, 2005.

ROSS A. WALTERS
UNITED STATES MAGISTRATE JUDGE
(By assignment and order pursuant to
 28 U.S.C. § 636(f))